UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
-----------------------------------------------------------x
SHENGLI ZHANG                          :
1843 Capitol Ave., N.E.                :
Washington, D.C. 20002,                :
                                       :   CIVIL ACTION NO.:
          Plaintiff,                   :
                                       :
          v.                           :   COMPLAINT
                                       :
MICHAEL CHERTOFF, in his official      :
capacity as Secretary of the           :
Department of Homeland Security, and   :
                                       :
EMILIO T. GONZALEZ, in his official    :
capacity as Director of the            :
U.S. Citizenship & Immigration Services, and :
                                       :
ALBERTO R. GONZALEZ his official       :
Capacity as Attorney General of the    :
Department of Justice,                 :
                                       :
          Defendants.                  :
-----------------------------------------------------------x
```

## COMPLAINT

### PRELIMINARY STATEMENT

1.    This is an individual action for declaratory and mandamus relief, authorized by

the Declaratory Judgment Act, 28 U.S.C. § 1361, and the Administrative Procedure Act, 5

U.S.C. §§ 551 *et seq*. and 5 U.S.C. §§ 701 *et seq*. This action is to provide Plaintiff Shengli

Zhang (hereinafter "Mr. Zhang") relief from the U.S. Citizenship & Immigration Services'

("USCIS") *et al*. willful violations of the law, and bureaucratic inaction and errors.

2.    Mr. Zhang, a 52-year-old citizen of the People's Republic of China, has applied

for asylum in the United States.  Mr. Zhang who was born in Tiajin, China, near Beijing, on

March 4, 1954, has demonstrated a lifetime commitment to freedom and democracy, which has

resulted in his persecution, four years imprisonment in hard labor and torture by the government of the People's Republic of China, and continued fear of being returned to China for more imprisonment and torture. Mr. Zhang met all the requirements for an asylum applicant, submitting valid documentation that will serve to corroborate his allegations against the Chinese government and prove the extent and duration of his persecution.

3.      Mr. Zhang submitted a valid I-589 Application for Asylum and for Withholding of Removal with the U.S. Citizenship and Immigration Services ("USCIS") that was received by the agency. (Exhibit 1)

4.      The Defendants have indefinitely delayed a determination on whether to grant or deny Mr. Zhang's application for asylum.

5.      Defendants are required to process and adjudicate Mr. Zhang's application in accordance with the law and agency procedure regarding asylum applications and to do so within a reasonable time. They have not done so and, upon information and belief, Defendants have not processed or adjudicated Mr. Zhang's asylum application.

6.      Mr. Zhang therefore brings this action requesting that this Court hear his asylum petition, and after such hearing make a declaration that he is entitled to seek refuge in the United States, issue an order granting him refugee status, and grant him his attorney's fees and costs as provided for by law.

<u>JURISDICTION AND VENUE</u>

7.      This Court has jurisdiction over this case under 5 U.S.C. §§ 702 and 706, as an action to review and compel agency action when it has been unlawfully withheld or unreasonably delayed, and to set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. This court

2

also has jurisdiction over this case under 28 U.S.C. § 1331, as an action arising under the Constitution and laws of the United States, under 28 U.S.C. § 1361, as an action of mandamus to compel a United States employee to perform a duty, under 28 U.S.C. § 2412 (d) to reimburse a party for litigating unreasonable and unlawful agency actions.

8.    An actual controversy has arisen and now exists between Plaintiff and Defendants.

PARTIES

9.    Plaintiff Shengli Zhang, is a 52-year-old citizen of the Republic of China (his country of last residence) and a current resident of Washington, D.C.

10.    Defendant Emilio T. Gonzalez is the Director of the U.S. Citizenship & Immigration Services, an agency within the Department of Homeland Security charged with administering and enforcing the laws related to immigration and nationality pursuant to the transfer of authority to the Secretary of Homeland Security of the United States under 6 U.S.C. § 271.  He is sued in his official capacity only.

11.    Defendant Michael Chertoff is the Secretary of the U.S. Department of Homeland Security and as such is charged with the administration and enforcement of the Immigration and Nationality Act and all other laws relating to the immigration and naturalization of aliens under 6 U.S.C. §§ 111, 112.  He is sued in his official capacity only.

12.    Defendant Alberto R. Gonzalez is the United States Attorney General and head of the Department of Justice and as such is charged with enforcing the Constitution and laws of the United States. He is sued in his official capacity only.

PROCEDURAL HISTORY

13.    Mr. Zhang timely filed for asylum on February 2, 1998 with the Immigration and

3

Naturalization Service's ("INS") Boston office.

14.    Immigration Judge ("IJ") Patricia Sheppard issued a decision on November 7, 2000 denying Mr. Zhang's application for asylum and withholding of removal and ordering him to be removed and deported to the People's Republic of China.  In her decision, the IJ made numerous errors of law and fact and prejudice through her erroneous and biased analysis and statements.  Among other issues, the IJ required that Mr. Zhang locate a specific corroborative witness who was employed at the U.S. Embassy in Beijing even though corroborative evidence is not required to establish an asylum claim.  Turcios v. INS, 821 F.2d 1396, 1402 (9th Cir. 1987)(reasoning that "refugees rarely are able to offer direct corroboration of specific threats or specific incidents of persecution.").  The BIA may not base its decision on a failure to provide specific corroborative evidence.  Diallo v. INS, 232 F.3d 279 (2nd Cir. 2000).  A denial of asylum may not be based on a lack of specific corroborative evidence.  Khan v. INS, 237 F.3d 1143 (9th Cir. 2001).

15.    Mr. Zhang was then unable to locate the specific witness.  Without this specific corroborative proof, despite the law, the IJ found that Mr. Zhang was not credible and refused to believe Mr. Zhang's because his story "seem[s] to be somewhat fantastic".  Unfortunately, at that time, the adjudication by IJs were increasingly "lacking in reason, logic, and effort", see N'Diom v. Gonzales, 442 F.3d. 494 (6th Cir. 2006), and that "horror stories persist of nasty, arrogant, and condescending immigration courts", see id. (citing Rexha v. Gonzales, .2006 WL 229796, *5 n.3 (6th Cir. 2006); see also id. (Adam Liptak, Courts Criticize Judges' Handling of Asylum Cases, N.Y. Times, Dec. 26, 2005); Benslimane v. Gonzales, 430 F.3d 828 (7th Cir. 2005)(reviewing the history of erroneous IJ and BIA decisions and finding that " a staggering 40 percent" of the reviewed petitions were reversed). The decision by the IJ regarding Zhang was one of the more

egregious of IJ decisions.

16.     Mr. Zhang, through his then-attorney, did not timely appeal the original IJ's finding since, among other reasons, he had not at the time of that hearing found the evidence demanded and required of him by the IJ.

17.     Plaintiff then obtained pro bono counsel to right the injustice and to assist in obtaining the "required" corroborative evidence.  The new evidence that was discovered by pro bono counsel included finding the U.S. Embassy Employee – who submitted an affidavit corroborating Mr. Zhang's testimony (Exhibit (1) at 000007-10) – and the support of additional documentary evidence.  The specific evidence corroborated Mr. Zhang's "fantastic story."

18.     Counsel then filed a Motion to Reopen and Reconsider, which was denied by the Board of Immigration Appeals in an unreported opinion.

19.     The administrative denial was appealed to the U.S. Court of Appeals for the First Circuit.  In an opinion issued on November 3, 2003, the First Circuit factually determined that Mr. Zhang had been imprisoned by the Chinese government for a period of four (4) years in hard labor for "counter-communist behaviors." Zhang v. INS, 348 F.3d 289 (1st Cir. 2003).  In oral argument, under questioning by the U.S. Court of Appeals judges, the Department of Justice attorney admitted that, had Mr. Zhang made a timely appeal of the original decision, based on the new evidence in his motion to Reopen and reconsider, the Court would have legally found in his favor.

20.     Nonetheless, the First Circuit denied Mr. Zhang's appeal of his Motion to Reopen and Reconsider on complex legal procedural grounds, finding that the Court lacked the jurisdiction to review the decision of the IJ and BIA that denied asylum and therefore could not review the additional evidence.

21.    In accordance with the administrative procedure permitting a party to submit a new application for asylum and, notably, if there exists any changed circumstances affecting a person's eligibility for asylum, Mr. Zhang filed a new application containing all of the extensive corroborating evidence, including the specific evidence demanded by the IJ.  On May 12, 2004, Mr. Zhang submitted a valid I-589 Application for Asylum and for Withholding of Removal with the U.S. Citizenship and Immigration Services ("USCIS") based on the new evidence. (Exhibit (1)).

22.    The Application was sent to the Service Center for the District of Columbia, which was the Texas Service Center at that time.  The Texas Service Center received Zhang's application.

23.    Contrary to the administrative procedure and regulation, the agency Service Center did not mail an Acknowledgement of Receipt notice with a receipt number within three (3) business days nor, upon information and belief, place it in the applicant's file (A-file) within ten (10) business days.  Upon information and belief, the Service Center did not forward the new A-file to the appropriate asylum office within twenty-one (21) days of receipt.

24.    The agency did not schedule the applicant for a new interview nor provide a new adjudication.  The agency did not state any valid prohibitions on filing.

<u>STATUTORY, REGULATORY AND ADMINISTRATIVE PROVISIONS AND PROCEDURES INVOLVED</u>

25.    The Immigration and Naturalization Act, I.N.A.  § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A)(2002), provides in pertinent part:

Sec. 1101. Definitions
    a) As used in this chapter—

        (42) The term ``refugee'' means
            (A) any person who is outside any country of such person's

6

nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of . . . political opinion.

26.    The Code of Federal Regulations, 8 C.F.R. § 208.13(b)(1)(2003) (emphasis added) provides in pertinent part:

Sec. 208.13 Establishing asylum eligibility.

(b) Eligibility. The applicant may qualify as a refugee either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution.

(1) Past persecution. An applicant shall be found to be a refugee on the basis of past persecution if the applicant can establish that he or she has suffered persecution in the past in the applicant's country of nationality . . . on account of . . . political opinion, and is unable or unwilling to return to, or avail himself or herself of the protection of, that country owing to such persecution. An applicant who has been found to have established such past persecution shall also be presumed to have a well-founded fear of persecution on the basis of the original claim. That presumption may be rebutted if an asylum officer or immigration judge makes one of the findings described in paragraph (b)(1)(i) of this section.

27.    Upon receipt of an I-589 Application, the agency Service Center mails an Acknowledgement of Receipt notice with a receipt number within three (3) business days and places it in the applicant's file (A-file) within ten (10) business days. The Service Center forwards the new A-file to the appropriate asylum office within twenty-one (21) days of receipt.

28.    The agency is required to schedule the applicant for a new interview and provide a new adjudication. Any prohibitions on filing – which does not include prior filings or denials – are addressed at the asylum interview.

FACTS

29.     Plaintiff Shengli Zhang is a 52-year-old citizen of the People's Republic of China (his country of last residence) and resident of Washington, D.C.

30.     Plaintiff Shengli Zhang, born in Tianjin, China near Beijing, on March 4, 1954, has demonstrated a lifetime commitment toward freedom and democracy, which has resulted in his persecution, imprisonment and torture by the government of the Peoples Republic of China. As a youth, after graduating from school in 1970, he was assigned a job as a machinist in a local factory.  At this time during the Cultural Revolution,[1] when all the universities were closed and citizens were forced to labor on farm collectives, the government assigned Mr. Zhang to work as a machinist in a local factory, an extremely desirable position for a young man.  At the age of 22 in 1976, Mr. Zhang was promoted to the local city's Bureau of Transportation and Transit. Within a year, however, Mr. Zhang was demoted back to his former factory position when the communist government found that his political viewpoints were not in line with the official propaganda guidelines.  Over the subsequent years, Mr. Zhang educated himself about democracy, human rights, capitalism and freedom and hatched a plan to escape to the west and eventually bring these western values to China.

31.     Shengli Zhang began his quest for freedom and democracy at the age of 27 at 9:00 P.M. in August 1981, by climbing over the wall of the British Embassy.  Mr. Zhang's request for asylum was not accepted and he was driven in the middle of the night by the embassy staff to a quiet Beijing neighborhood.  Mr. Zhang's actions were not discovered.

32.     Then, almost a year later on April 17, 1982, Mr. Zhang made a similar attempt,

---

1 See State Department Report ("The Cultural Revolution period, 1966-1976, was one of sustained political and economical upheaval during which millions of citizens across the country were brutalized arbitrarily.").

this time at the U.S. Embassy, taking his diaries and writings on the Chinese government and claiming political asylum. The Peking, China section of the U.P.I. news service and Reuters news service reported on the incident. (Exhibit (1) at 000265, 000267).

33.    This time, the Chinese government had discovered his actions and demanded his return. Because the State Department feared that Mr. Zhang's actions would worsen already difficult international relations concerning Taiwan – see Exhibit (2) New York Times article on the international crisis on the same date – it ordered the diplomatic official at the U.S. Embassy, Charles M. Martin, then First Secretary of the Political Section of the U.S. Embassy in Beijing,[2] to deliver Zhang to Chinese authorities to not increase the tensions.

34.    Mr. Zhang was immediately arrested by the Chinese police and jailed in a Beijing detention facility. He was "interrogated"[3] by the police for 49 days. The Chinese Government granted Mr. Zhang no rights and there was no trial, sentencing him to two years forced labor at a Reformation Farm. Upon being located by counsel in 2002, Mr. Martin corroborated Mr. Zhang's account and filed an affidavit on his behalf. (Exhibit (1) at 000007-10).

35.    A year after his attempt for freedom, Mr. Zhang escaped from the Reformation Farm and hid for 20 days in an underground hotel, while attempting to contact the U.S. Embassy. During this period, Mr. Zhang's parents were also interrogated and threatened many times. He was finally caught by the Chinese authorities and jailed in various facilities.

36.    In December 1983, Mr. Zhang was indicted and on July 1, 1984, Mr. Zhang was convicted of "counter-communist behaviors" and "insisting on [his] counter-communist view"

---

2 Mr. Martin left the State Department in 1988. In 2002, he was Vice-President of Corporate Communications for Asia-Pacific at the Monsanto Company.

3 See the description of Mr. Zhang's interrogation and imprisonment at the hands of Chinese government authorities at a labor camp. (Exhibit (1) at Part B., Item 2, p. 5).

and sentenced to two additional years (for a total of four years) imprisonment at the Department of Correction Through Hard Labor Xinjiang Production and Construction Corps. Some of the horrors of Mr. Zhang's torture and imprisonment are described in (Exhibit (1) at Part B, Item 2, Attachment, p. 5-8).

37.    Over four years after his attempt to defect to the U.S., Mr. Zhang was released from prison on June 2, 1986. An official document describing Mr. Zhang's original sentence and later modification was submitted. (Exhibit (1) at 000251)). An official document describing Mr. Zhang's subsequent release from prison was submitted. (Exhibit (1) at 000587)). These documents specifically describe the political nature of Mr. Zhang's "crime".

38.    Upon his release, Mr. Zhang faced continued persecution at the hands of the Chinese government in the time after his release.

39.    Since Mr. Zhang's arrival in the U.S., he has dedicated himself to his original proposition, seeking freedom and democracy for himself and his fellow Chinese citizens. Mr. Zhang became involved with an organization called The Party for Freedom and Democracy in China and participated in several protests, including protests near the Chinese Embassy in Washington, D.C., the Chinese Consulate General in New York City, and the White House. These protests were recorded on videotape by Chinese authorities.[4]  The World Journal, the largest Chinese language newspaper, carried the story of the White House protest, for which Mr. Zhang played a prominent role, on its front-page headline. Radio Free Asia, created by Congress for broadcast into China, broadcast the protest live to its audience in mainland China.

40.    Since Mr. Zhang's arrival in the U.S, a Chinese police officer has several times

---

4 Eight Individuals Protest at Performance of China's Central Ensemble, The World Journal (September 8, 2000)(naming "Zhang Shengli" as one of the eight "activists" and including a group photograph of the eight).

gone to Mr. Zhang's home in China and interrogated Mr. Zhang's wife.  The Chinese authorities

confiscated all letters that Mr. Zhang wrote to his wife and asked her to tell him to come back to

China immediately.

41.     Since the People's Republic of China released Mr. Zhang from prison, the

communist government has only become more obsessed about suppressing dissenters, especially

those espousing the principles of freedom and democracy.[5]  Analysts have stated that China has

been emboldened as its economic power has increased.  In recent years, the Chinese government

has arrested mothers and babies, American citizens and legal Chinese-American emigrants and

immigrants and a New York Times journalist under a variety of political pretexts and subjected

them to long periods of interrogation and detention.[6]  China has arrested and given jail sentences

---

5 See China: Profile of Asylum Claims and Country Conditions, U.S. Department of State (April 14, 1998).

> The People's Republic of China (PRC) is an authoritarian state in which the Chinese
> Communist Party (CCP) is the paramount source of power.  Leaders stress the need to
> maintain stability and social order and are committed to perpetuating the rule of the CCP
> and its hierarchy. . . .
>
> The security apparatus is composed of the Ministries of State Security and Public
> Security, the People's Armed Police, the People's Liberation Army, and the state judicial,
> prosecutorial, and penal systems.  The security forces are responsible for numerous
> human rights abuses.
> . . . .
> Claims Based on Political Opinion
> [T]he Government continues to commit widespread and well-documented human rights
> abuses, in violation of internationally accepted norms, stemming both from the
> authorities' intolerance of dissent and fear of unrest, and the limited scope or inadequate
> implementation of laws that protect basic freedoms.  Abuses include arbitrary arrest and
> lengthy incommunicado detention, forced confessions, torture, and mistreatment of
> prisoners.  A 1995 law raised the number of capital offenses from 26 to 65 [and] China
> sentenced more than 6,100 convicts to death and carried out 4,367 executions.
> . . . .
> [Although t]he Government released a few political prisoners on medical parole or before
> their terms were over[, t]housands of others [] remain in prison for the peaceful
> expression of their political, social, or religious views.

6 See Proposed Senate Resolution Urges China to Release Li Shaomin, Senate Resolution 128, located at

for the following "crimes": political activism against China's "one child" forced sterilization and abortion policy (four year sentence), organizing a political protest, printing Bibles, reporting about political and media controls (ten year sentence), writing "subversive" articles about poverty and unemployment using Hotmail (7 year sentence), participating in a political protest hunger strike, and writing blogs or unregistered web sites. At least 54 people are in prison for using the internet to disseminate political opinions the Chinese government considers dangerous.

42.    Two examples are notable. Two web operators, Yan Peng and Chen Rongli, are currently threatened with imprisonment and the potential use of the death penalty for escaping from a Chinese jail after helping pro-democracy activists set up web sites and starting a pro-democracy party. U.S. filmmaker Hao Wu returned to his hometown in China and, after writing about the ideal of American civil liberty, was arrested on the basis of "state secrets" and held indefinitely.

43.    Even the U.S. State Department, recognized for frequently ignoring human rights concerns,[7] states that "Arbitrary detention, torture, and extrajudicial killings remained common tools of political and religious repression. Public security forces all too frequently tortured detainees in China."[8] China continues to target and persecute political dissidents. China executes over 90% of the total people in the world and legislators recommend "goals" for

---

http://usembassy.state.gov/posts/ja1/wwwhgl0077.html (July 11, 2001).

> Whereas in recent months the Government of the People's Republic of China has arrested and detained several scholars and intellectuals of Chinese ancestry with ties to the United States, including at least 2 United States citizens and 3 permanent residents of the United States.

7 See Gramatikov v. INS, 128 F. 3d 619, 620 (7th Cir. 1997) ("there is perennial concern that the [State] Department softpedals human rights violations by countries that the United States wants to have good relations with.").

8 Introduction to Country Reports on Human Rights Practices, U.S. Department of State, located at http://usembassy.state.gov/posts/pk1/wwwh02030507.html (March 05, 2002).

numbers of executions.  Many of the executions occur after summary trials and target "repeat" offenders.

44.    In addition to his activism on behalf of democracy, Mr. Zhang's plight has been featured by prominent news organizations such as the Wall Street Journal, which is still available online.  (Exhibit (3)).  In that article, Mr. Zhang described to the world his fear should he be sent back to China.  "His mouth tight with worry, Mr. Zhang describes the welcome that awaits him back in China: 'They will be waiting for me at the airport. They will handcuff me. They will not even give me a chance to go home. I will go directly to jail.'"  Id.  This article has been featured on Chinese web sites.  (Exhibit (4)).

45.    Zhang has a well founded fear of future persecution as a "repeat" offender of promoting democracy over communism, embarrassing politically the existing totalitarian government through news articles, determinations in one of the highest courts in the U.S., and political protest.  Zhang's years of torture and his near-death experience in China's prisons at the hands of the government authorities are continually in his mind.

46.    Upon finding a "compelling case of past persecution," the burden is shifted to the government of "rebutting the presumptive fear of future persecution."  Bace v. Ashcroft, 352 F.3d 1133 (7th Cir. 2003).

47.    This burden shift is an important protection provided for in 8 U.S.C. § 1101(a)(42)(A)(2002) and 8 C.F.R. § 208.13(b)(1)(2003) for those who have experienced persecution.  No court of which we are aware has determined that an applicant has experienced past persecution without granting refugee status and shifting the burden to the government to explain why no credible fear of future persecution exists.

48.    No court of which we are aware has found that an applicant has experienced past

persecution by the same government and permitted him to be sent back to his persecutor.

49.     Mr. Zhang was at all times and remains at present in very real danger of suffering imprisonment or even death as a result of his very public pro-democratic and anti-communist positions, particularly regarding the Chinese government, and thus is entitled to asylum in the United States.

50.     Mr. Zhang has a credible fear of future persecution should he be returned to his persecutor.

51.     Mr. Zhang has continuously resided in the U.S. since his arrival.

52.     Mr. Zhang has never been arrested in the U.S. nor has he committed other criminal acts. His arrest in China for committing the political crime of engaging in "counter-communist behaviors," is a political charge/crime that is not valid under U.S. and international law.

53.     Mr. Zhang has not committed immoral acts.  Plaintiff has demonstrated that he is a person of good moral character pursuant to 8 C.F.R. § 316.10 and that his character and conduct exceeds the average citizen in his Washington D. C. community.

54.     Plaintiff has not given false testimony to obtain an immigration benefit.

55.     Pursuant to 8 C.F.R. § 313.2, Plaintiff has never favored totalitarian dictatorship or communist forms of government, nor has he been connected in any manner with any organization that does so.

56.     Pursuant to 8 C.F.R. § 315.2, Plaintiff has never requested, applied, or obtained an exemption from military service on the grounds that he is an alien.

57.     On February 13, 1998, Mr. Zhang made a statement under oath detailing the harm and mistreatment and threats that he had suffered at the hands on the Chinese government.

14

58.    The USCIS's delay in adjudicating Plaintiff's application is unreasonable.

59.    The USCIS's refusal to apply the clear law in adjudicating Plaintiff's application is unreasonable.

60.    The actions of Defendants described above have no reasonable basis in fact or law and are not substantially justified.

61.    While this Court has the option under the cited statutes to remand this matter to the USCIS, Plaintiff respectfully requests that the Court hear the matter itself because sufficient information exists for the court to make a determination in law and fact and the interest of justice would not be served by sending the matter back to a forum that has already violated Plaintiff's legal rights.

<u>CAUSE OF ACTION</u>

62.    Defendants' failure to adjudicate Plaintiff's asylum application status in a reasonably timely fashion and failure to follow the law and administrative procedure has harmed Plaintiff, is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and is subject to this Court's review under 5 U.S.C. § 702.

63.    Defendants' failure to provide any grounds for prohibiting the applicant's application in accordance with administrative procedure is an admission or otherwise a waiver of that no grounds exist.

64.    Defendants' personal bias and corresponding failure to act impartially is subject to this Court's review under 5 U.S.C. §§ 556.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that this Honorable Court:

A.    Enter an order for mandamus declaring the Defendants' failure to adjudicate

15

Plaintiff's asylum application within a reasonable time and in accordance with administrative procedure to be arbitrary, capricious, not in accordance with law, and in violation of the rights of Plaintiff;

B.     Enter an order granting asylum based on the undisputed finding of fact that Plaintiff suffered past persecution by the same Chinese communist government, the Defendants failed to rebut the presumptive fear of future persecution, and there exists no prohibitions;

C.     Grant Plaintiff reasonable attorney's fees under 28 U.S.C. § 2412(d) and all reasonable costs and expenses herein, together with any and all additional relief to which Plaintiff may be entitled.

Respectfully submitted,

CONWELL, LLC

Scott A. Conwell (Bar No. 468989)
scott@conwellusa.com
2138 Priest Bridge Court, Suite No. 4
Crofton, Maryland 21114
TELE: (410) 451-2707
FAX: (410) 451-2706

*Attorney for Plaintiff*

Dated: July 3, 2007

16

U.S. Department of Justice
Immigration and Naturalization Service

OMB No. 1115-0086

# Application for Asylum and for Withholding of Removal

Form I-589 (Rev. 10/18/01)N

*Start Here - Please Type or Print.* USE BLACK INK. SEE THE SEPARATE INSTRUCTION PAMPHLET FOR INFORMATION ABOUT ELIGIBILITY AND HOW TO COMPLETE AND FILE THIS APPLICATION. (Note: There is NO filing fee for this application.)

*Please* check the box if you also want to apply for withholding of removal under the Convention Against Torture. ☒

## PART A. I.  INFORMATION ABOUT YOU

| | |
|---|---|
| 1. Alien Registration Number(s)(A#'s)*(If any)*    A 75-983-726-Boston | 2. Social Security No. *(If any)*    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 |

| 3. Complete Last Name    ZHANG | 4. First Name    Shengli | 5. Middle Name    none |
|---|---|---|

6. What other names have you used? *(Include maiden name and aliases.)*
none

| 7. Residence in the U.S.    C/O  Shengli Zhang | Telephone Number    none |
|---|---|
| Street Number and Name    1843 Capitol Ave., N.E. | Apt. No. |

| City    Washington | State    DC | ZIP Code    20002 |
|---|---|---|

| 8. Mailing Address in the U.S., if other than above    n/a | Telephone Number |
|---|---|
| Street Number and Name | Apt. No. |
| City | State | ZIP Code |

| 9. Sex ☒ Male ☐ Female | 10. Marital Status: ☐ Single ☒ Married ☐ Divorced ☐ Widowed |
|---|---|

| 11. Date of Birth *(Mo/Day/Yr)*    03/04/1954 | 12. City and Country of Birth    Tianjin, China |
|---|---|

| 13. Present Nationality *(Citizenship)*    China | 14. Nationality at Birth    China | 15. Race, Ethnic or Tribal Group    Asian | 16. Religion    n/a |
|---|---|---|---|

17. Check the box, a through c that applies:  a. ☐ I have never been in immigration court proceedings.
b. ☐ I am now in immigration court proceedings.  c. ☒ I am **not** now in immigration court proceedings, but I have been in the past.

18. *Complete 18 a through c.*
a. When did you last leave your country? *(Mo/Day/Yr)* 3/12/1997  b. What is your current I-94 Number, if any? 55670280503

c. Please list each entry to the U.S. beginning with your most recent entry.
*List date (Mo/Day/Yr), place, and your status for each entry. (Attach additional sheets as needed.)*

| Date | Place | Status | |
|---|---|---|---|
| 8/3/1996 | San Francisco, CA | B-1 | Date Status Expires   6/11/1997 |
| 3/12/1997 | San Francisco, CA | B-1 | |
| | | | |
| | | | |

| 19. What country issued your last passport or travel document?  China | 20. Passport #   n/a   Travel Document # | 21. Expiration Date *(Mo/Day/Yr)* |
|---|---|---|

| 22. What is your native language?   Mandarin | 23. Are you fluent in English? ☐ Yes ☒ No | 24. What other languages do you speak fluently?   n/a |
|---|---|---|

| FOR EOIR USE ONLY | | FOR INS USE ONLY |
|---|---|---|
| | **Action:** | |
| | Interview Date: _____ | |
| | **Decision:** | |
| | — Approval Date: _____ | |
| | — Denial Date: _____ | |
| | — Referral Date: _____ | |
| | Asylum Officer ID# _____ | |

Form I-589 (Rev. 10/18/01)N

OMB No. 1115-0086

**PART A. II.    INFORMATION ABOUT YOUR SPOUSE AND CHILDREN**

**Your Spouse.** ☐ I am not married. (Skip to *Your Children, below.*)

| 1. Alien Registration Number (A#) *(If any)* | 2. Passport/ID Card No. *(If any)* | 3. Date of Birth *(Mo/Day/Yr)* | 4. Social Security No. *(If any)* |
|---|---|---|---|
| none | none | 01/09/1964 | |

| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Maiden Name |
|---|---|---|---|
| YANG | Ailin | none | n/a |

| 9. Date of Marriage *(Mo/Day/Yr)* | 10. Place of Marriage | 11. City and Country of Birth |
|---|---|---|
| 12/18/1987 | Beian, China | Beian, China |

| 12. Nationality *(Citizenship)* | 13. Race, Ethnic or Tribal Group | 14. Sex ☐ Male ☑ Female |
|---|---|---|
| China | Asian | |

15. Is this person in the U.S.? ☐ Yes *(Complete blocks 16 to 24.)* ☑ No *(Specify location)*

| 16. Place of last entry in the U.S. | 17. Date of last entry in the U.S. *(Mo/Day/Yr)* | 18. I-94 No. *(If any)* | 19. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| | | | |

| 20. What is your spouse's current status? | 21. What is the expiration date of his/her authorized stay, if any? *(Mo/Day/Yr)* | 22. Is your spouse in immigration court proceedings? ☐ Yes ☐ No | 23. If previously in the U.S., date of previous arrival *(Mo/Day/Yr)* |
|---|---|---|---|
| | | | |

24. If in the U.S., is your spouse to be included in this application? *(Check the appropriate box.)*

☐ Yes *(Attach one (1) photograph of your spouse in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
☐ No

**Your Children.** Please list **ALL** of your children, regardless of age, location, or marital status.

☐ I do not have any children. *(Skip to Part A. III., Information about Your Background.)*
☑ I do have children. Total number of children ___1___

*(Use Supplement A Form I-589 or attach additional pages and documentation if you have more than four (4) children.)*

| 1. Alien Registration Number (A#) *(If any)* | 2. Passport/ID Card No. *(If any)* | 3. Marital Status *(Married, Single, Divorced, Widowed)* | 4. Social Security No. *(If any)* |
|---|---|---|---|
| n/a | n/a | single | |

| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth *(Mo/Day/Yr)* |
|---|---|---|---|
| ZHANG | Xi | none | 10/13/1988 |

| 9. City and Country of Birth | 10. Nationality *(Citizenship)* | 11. Race, Ethnic or Tribal Group | 12. Sex ☑ Male ☐ Female |
|---|---|---|---|
| Tianjin, China | China | Asian | |

13. Is this child in the U.S.? ☐ Yes *(Complete blocks 14 to 21.)* ☑ No *(Specify Location)*

| 14. Place of last entry in the U.S.? | 15. Date of last entry in the U.S.? *(Mo/Day/Yr)* | 16. I-94 No. *(If any)* | 17. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| | | | |

| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? *(Mo/Day/Yr)* | 20. Is your child in immigration court proceedings? ☐ Yes ☐ No |
|---|---|---|
| | | |

21. If in the U.S., is this child to be included in this application? *(Check the appropriate box.)*
☐ Yes *(Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
☐ No

Form I-589 (Rev. 10/18/01)N Page 2

OMB No. 1115-0086

## PART A. III.    INFORMATION ABOUT YOUR BACKGROUND

1. Please list your last address where you lived before coming to the U.S.  If this is not the country where you fear persecution, also list the last address in the country where you fear persecution. *(List Address, City/Town, Department, Province, or State, and Country.)  (Use Supplement B Form I-589 or additional sheets of paper if necessary.)*

| Number and Street *(Provide if available)* | City/Town | Department, Province or State | Country | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|---|
| 79 Complex 36, Songheli Lushandao | Tianjin | | China | 1992 | 03/97 |

2. Provide the following information about your residences during the last five years.  List your present address first. *(Use Supplement Form B or additional sheets of paper if necessary.)*

| Number and Street | City/Town | Department, Province or State | Country | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|---|
| 1843 Capitol St., N.E. | Washington | DC | USA | 12/99 | present |
| 25 Old Colony Ave., #2 | Quincy | MA | USA | 1999 | 12/99 |
| 22 Pierce ST., #1 | Malden | MA | USA | 06/97 | 1999 |
| 48 Warren Ave., #3 | Malden | MA | USA | 03/97 | 06/97 |

3. Provide the following information about your education, beginning with the most recent. *(Use Supplement B Form I-589 or additional sheets of paper if necessary.)*

| Name of School | Type of School | Location (Address) | Attended From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|
| Anti-Revisionist | Middle School | Tianjin, China | | 1970 |
| | | | | |
| | | | | |
| | | | | |

4. Provide the following information about your employment during the last five years.  List your present employment first. *(Use Supplement Form B or additional sheets of paper if necessary.)*

| Name and Address of Employer | Your Occupation | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|
| Independent Contractor | labor | 1997 | present |
| | | | |
| | | | |
| | | | |

5. Provide the following information about your parents and siblings (brother and sisters).  Check box if the person is deceased. *(Use Supplement B Form I-589 or additional sheets of paper if necessary.)*

| Name | City/Town and Country of Birth | Current Location |
|---|---|---|
| *Mother* Xiuqing ZHANG | Tianjin, China | ☐ Deceased |
| *Father* Jinyuan LIU | | ☑ Deceased |
| *Siblings* | | ☐ Deceased |
| | | ☐ Deceased |

OMB No. 1115-0086

## PART B.    INFORMATION ABOUT YOUR APPLICATION

*(Use Supplement B Form I-589 or attach additional sheets of paper as needed to complete your responses to the questions contained in PART B.)*

When answering the following questions about your asylum or other protection claim (withholding of removal under 241(b)(3) of the Act or withholding of removal under the Convention Against Torture) you should provide a detailed and specific account of the basis of your claim to asylum or other protection.  To the best of your ability, provide specific dates, places, and descriptions about each event or action described.  You should attach documents evidencing the general conditions in the country from which you are seeking asylum or other protection and the specific facts on which you are relying to support your claim.  If this documentation is unavailable or you are not providing this documentation with your application, please explain why in your responses to the following questions. Refer to Instructions, Part 1: Filing Instructions, Section II, "Basis of Eligibility," Parts A - D,  Section V, "Completing the Form," Part B, and Section VII, "Additional Documents that You Should Submit" for more information on completing this section of the form.

1.   Why are you applying for asylum or withholding of removal under section 241(b)(3) of the Act, or for withholding of removal under the  Convention Against Torture?  Check the appropriate box (es) below and then provide detailed answers to questions A and B below:

I am seeking asylum or withholding of removal based on

- ☐ Race
- ☐ Religion
- ☐ Nationality
- ☑ Political opinion
- ☐ Membership in a particular social group
- ☑ Torture Convention

A.   Have you, your family, or close friends or colleagues ever experienced harm or mistreatment or threats in the past by anyone?
☐ No  ☑ Yes  If your answer is "Yes," explain in detail:

1)  What happened;
2)  When the harm or mistreatment or threats occurred;
3)  Who caused the harm or mistreatment or threats; and
4)  Why you believe the harm or mistreatment or threats occurred.

Please see Exhibit No. 1, Sworn Statement of Shengli Zhang, dated Feb. 13, 1998.  See also the attached documentation.

B.   Do you fear harm or mistreatment if you return to your home country?

☐ No   ☑ Yes  If your answer is "Yes," explain in detail:

1)  What harm or mistreatment you fear;
2)  Who you believe would harm or mistreat you; and
3)  Why you believe you would or could be harmed or mistreated.

Please see attached documentation.

OMB No. 1115-0086

**PART B.    INFORMATION ABOUT YOUR APPLICATION Continued**

2.  Have you or your family members ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country other than the United States?

☐ No    ☑ Yes  If "Yes," explain the circumstances and reasons for the action.

```
Please see attached documentation.
```

3. A.  Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?

☑ No    ☐ Yes  If "Yes," describe for each person the level of participation, any leadership or other positions held, and the length of time you or your family members were involved in each organization or activity.

B.  Do you or your family members continue to participate in any way in these organizations or groups?

☐ No    ☑ Yes  If "Yes," describe for each person, your or your family members' current level of participation, any leadership or other positions currently held, and the length of time you or your family members have been involved in each organization or group.

```
Although I did not participate in organizations or groups in my home country due to
severe past torture and imprisonment and continued threat of the same or worse
punishment, since my arrival in the U.S., I have participated in organizations and
groups within the U.S. that support freedom and democracy in China.
```

4.  Are you afraid of being subjected to torture in your home country or any other country to which you may be returned?

☐ No    ☑ Yes  If "Yes," explain why you are afraid and describe the nature of the torture you fear, by whom, and why it would be inflicted.

```
Please see attached documentation.
Part B., Item 1.B. discusses the harm and mistreatment that I fear would be
    inflicted on me should I be returned to my home country.
Part B., Item 2. discusses the torture that I have already experienced in my
    home country.
```

OMB No. 1115-0086

**PART C.    ADDITIONAL INFORMATION ABOUT YOUR APPLICATION**

*(Use Supplement B Form I-589 or attach additional sheets of paper as needed to complete your responses to the questions contained in Part C.)*

1.  Have you, your spouse, your child(ren), your parents, or your siblings ever applied to the United States Government for refugee status, asylum, or withholding of removal?   ☐ No  ☑ Yes

    If "Yes" explain the decision and what happened to any status you, your spouse, your child(ren), your parents, or your siblings received as a result of that decision.  Please indicate whether or not you were included in a parent or spouse's application.  If so, please include your parent or spouse's A- number in your response.  If you have been denied asylum by an Immigration Judge or the Board of Immigration Appeals, please describe any change(s) in conditions in your country or your own personal circumstances since the date of the denial that may affect your eligibility for asylum.

    ```
    Zhang applied for asylum in the past.  The final status of the application was
    that the U.S. Court of Appeals for the First Circuit determined that Zhang had
    been imprisoned by the Chinese government for four (4) years in hard labor for
    "counter-communist behaviors."  Please see the attached documents for more
    detail.
    ```

2.  A.  After leaving the country from which you are claiming asylum, did you or your spouse or child(ren), who are now in the United States, travel through or reside in any other country before entering the United States?   ☐ No  ☑ Yes

    B.  Have you, your spouse, your child(ren), or other family members such as your parents or siblings ever applied for or received any lawful status in any country other than the one from which you are now claiming asylum?   ☑ No  ☐ Yes

    If "Yes" to either or both questions (2A and/or 2B), provide for each person the following: the name of each country and the length of stay; the person's status while there; the reasons for leaving; whether the person is entitled to return for lawful residence purposes; and whether the person applied for refugee status or for asylum while there, and, if not, why he or she did not do so.

    ```
    2.A. Zhang left China on Mar. 12, 1997, aboard Northwest Airlines, bound for San
    Francisco.  The plane stopped in Tokyo, Japan for about 1.5 hours, and then flew
    directly to San Francisco.
    ```

3.  Have you, your spouse, or child(ren) ever ordered, incited, assisted, or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion?

    ☑ No  ☐ Yes  If "Yes," describe in detail each such incident and your own or your spouse's or child(ren)'s involvement.

OMB No. 1115-0086

**PART C.    ADDITIONAL INFORMATION ABOUT YOUR APPLICATION Continued**

4.   After you left the country where you were harmed or fear harm, did you return to that country?

&#9745; No    &#9744; Yes  If "Yes," describe in detail the circumstances of your visit (for example, the date(s) of the trip(s), the purpose(s) of the trip(s), and the length of time you remained in that country for the visit(s)).

```
Since Zhang came to the U.S. and applied for asylum, he did not leave the U.S.
However, Zhang originally came to the U.S. on a visa on 8/3/1996 and left on 8/13/1996
seeking assistance with the U.S. government and an attorney.  Zhang returned after he
was unsuccessful in securing governmental assistance and after receiving legal advice
to obtain certain evidence.  Aware of Chinese government procedures and monitoring,
Zhang returned believing that his travels and intent of applying for asylum would be
undiscovered by the Chinese government.  Please see the attached documentation for
further details.
```

5.   Are you filing the application more than one year after your last arrival in the United States?

&#9745; No    &#9744; Yes  If "Yes," explain why you did not file within the first year after you arrived.   You should be prepared to explain at your interview or hearing why you did not file your asylum application within the first year after you arrived.  For guidance in answering this question, see Instructions, Part I: Filing Instructions, Section V. "Completing the Form," Part C.

```
Zhang's original asylum application was timely filed.  This application is based on
the new evidence obtained since that application was filed and on the factual
determination by the Court.
```

6.   Have you or any member of your family included in the application ever committed any crime and/or been arrested, charged, convicted and sentenced for any crimes in the United States?

&#9745; No    &#9744; Yes  If "Yes," for each instance, specify in your response what occurred and the circumstances; dates; length of sentence received; location; the duration of the detention or imprisonment; the reason(s) for the detention or conviction; any formal charges that were lodged against you or your relatives included in your application; the reason(s) for release. Attach documents referring to these incidents, if they are available, or an explanation of why documents are not available.

```
Zhang's only crime is the subject of this application, a political crime not valid
under U.S. and international law.  The Chinese government charged and convicted Zhang
of the political crime of "counter-communist behaviors."
```

OMB No. 1115-0086

## PART D.    YOUR SIGNATURE

*After reading the information regarding penalties in the instructions, complete and sign below. If someone helped you prepare this application, he or she must complete Part E.*

I certify, under penalty of perjury under the laws of the United States of America, that this application and the evidence submitted with it are all true and correct. Title 18, United States Code, Section 1546, provides in part: "Whoever knowingly makes under oath, or as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or knowingly presents any such application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement or which fails to contain any reasonable basis in law or fact - shall be fined in accordance with this title or imprisoned not more than five years, or both." I authorize the release of any information from my record which the Immigration and Naturalization Service needs to determine eligibility for the benefit I am seeking.

Staple your photograph here or the photograph of the family member to be included on the extra copy of the application submitted for that person.

*WARNING:* Applicants who are in the United States illegally are subject to removal if their asylum or withholding claims are not granted by an Asylum Officer or an Immigration Judge. Any information provided in completing this application may be used as a basis for the institution of, or as evidence in, removal proceedings even if the application is later withdrawn. Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act. See 208(d)(6) of the Act and 8 CFR 208.20.

Print Complete Name    *Sheng Li Zhang*

Write your name in your native alphabet    张 生 丽

Did your spouse, parent, or child(ren) assist you in completing this application?    ☒ No    ☐ Yes *(If "Yes," list the name and relationship.)*

_____    _____        _____    _____
        *(Name)*                *(Relationship)*                    *(Name)*                *(Relationship)*

Did someone other than your spouse, parent, or child(ren) prepare this application?    ☐ No    ☒ Yes *(If "Yes," complete Part E)*

Asylum applicants may be represented by counsel. Have you been provided with a list of persons who may be available to assist you, at little or no cost, with your asylum claim?    ☐ No    ☒ Yes

Signature of Applicant *(The person in Part A. I.)*

[ _Shyn Zhny_ ]        Date *(Mo/Day/Yr)*    5/1/04

Sign your name so it all appears within the brackets

## PART E.    DECLARATION OF PERSON PREPARING FORM IF OTHER THAN APPLICANT, SPOUSE, PARENT OR CHILD

I declare that I have prepared this application at the request of the person named in Part D, that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant and that the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. 1324(c).

| Signature of Preparer | Print Complete Name |
|---|---|
| *Scott Conwell* | Scott A. Conwell |

| Daytime Telephone Number (410) 224-4546 | Address of Preparer: Street Number and Name  130 Lubrano Drive, Suite 112 | |
|---|---|---|

| Apt. No. | City  Annapolis | State  MD | ZIP Code  21401 |
|---|---|---|---|

## PART F.    TO BE COMPLETED AT INTERVIEW OR HEARING

*You will be asked to complete this Part when you appear before an Asylum Officer of the Immigration and Naturalization Service (INS), or an Immigration Judge of the Executive Office for Immigration Review (EOIR) for examination.*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are all true to the best of my knowledge taking into account correction(s) numbered _____ to _____ that were made by me or at my request.

Signed and sworn to before me by the above named applicant on:

_____        _____
Signature of Applicant        Date *(Mo/Day/Yr)*

_____        _____
Write Your Name in Your Native Alphabet        Signature of Asylum Officer or Immigration Judge

Form I-589 (Rev. 10/18/01)N Page 9

**U.S. Department of Justice**
Immigration and Naturalization Service

# Notice of Entry of Appearance
## as Attorney or Representative

**Appearances** - An appearance shall be filed on this form by the attorney or representative appearing in each case. Thereafter, substitution may be permitted upon the written withdrawal of the attorney or representative of record or upon notification of the new attorney or representative. When an appearance is made by a person acting in a representative capacity, his personal appearance or signature shall constitute a representation that under the provisions of this chapter he is authorized and qualified to represent. Further proof of authority to act in a representative capacity may be required. **Availability of Records** - During the time a case is pending, and except as otherwise provided in 8 CFR 103.2(b), a party to a proceeding or his attorney or representative shall be permitted to examine the record of proceeding in a Service office. He may, in conformity with 8 CFR 103.10, obtain copies of Service records or information therefrom and copies of documents or transcripts of evidence furnished by him. Upon request, he/she may, in addition, be loaned a copy of the testimony and exhibits contained in the record of proceeding upon giving his/her receipt for such copies and pledging that it will be surrendered upon final disposition of the case or upon demand. If extra copies of exhibits do not exist, they shall not be furnished free on loan; however, they shall be made available for copying or purchase of copies as provided in 8 CFR 103.10.

| In re: Shengli ZHANG | Date: 5/1/2004 |
| --- | --- |
| | File No. |

I hereby enter my appearance as attorney for (or representative of), and at the request of the following named person(s):

| Name: Shengli ZHANG | ☐ Petitioner ☑ Applicant |
| --- | --- |
| | ☐ Beneficiary |

| Address: (Apt. No.)   (Number & Street) | (City) | (State) | (Zip Code) |
| --- | --- | --- | --- |
| 1843      Capitol Ave., N.E. | Washington | DC | 20002 |

| Name: n/a | ☐ Petitioner ☐ Applicant |
| --- | --- |
| | ☐ Beneficiary |

| Address: (Apt. No.)   (Number & Street) | (City) | (State) | (Zip Code) |
| --- | --- | --- | --- |

*Check Applicable Item(s) below:*

☑ 1. I am an attorney and a member in good standing of the bar of the Supreme Court of the United States or of the highest court of the following State, territory, insular possession, or District of Columbia ___Scott A. Conwell___ ___Maryland___ and am not under a court or administrative agency
Name of Court
order suspending, enjoining, restraining, disbarring, or otherwise restricting me in practicing law.

☐ 2. I am an accredited representative of the following named religious, charitable, social service, or similar organization established in the United States and which is so recognized by the Board:

☐ 3. I am associated with _____
the attorney of record previously filed a notice of appearance in this case and my appearance is at his request. (*If you check this item, also check item 1 or 2 whichever is appropriate.*)

☐ 4. Others (Explain Fully.)

| SIGNATURE | COMPLETE ADDRESS |
| --- | --- |
| *[signature]* | USA LAW INC., 130 Lubrano Dr., Suite 112, Annapolis, MD 21401 |
| NAME (Type or Print) Scott A. Conwell | TELEPHONE NUMBER 410-224-4546 |

*PURSUANT TO THE PRIVACY ACT OF 1974, I HEREBY CONSENT TO THE DISCLOSURE TO THE FOLLOWING NAMED ATTORNEY OR REPRESENTATIVE OF ANY RECORD PERTAINING TO ME WHICH APPEARS IN ANY IMMIGRATION AND NATURALIZATION SERVICE SYSTEM OF RECORDS:*

___Scott A. Conwell___
(Name of Attorney or Representative)

*THE ABOVE CONSENT TO DISCLOSURE IS IN CONNECTION WITH THE FOLLOWING MATTER:*

| Name of Person Consenting Shengli ZHANG | Signature of Person Consenting *[signature]* | Date 5/1/04 |
| --- | --- | --- |

(NOTE: Execution of this box is required under the Privacy Act of 1974 where the person being represented is a citizen of the United States or an alien lawfully admitted for permanent residence.)

This form may not be used to request records under the Freedom of Information Act or the Privacy Act. The manner of requesting such records is contained in 8CFR 103.10 and 103.20 Et.SEQ.

Form G-28 (09/26/00)Y



Form I-589: APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF
DEPORTATION
Applicant: **Shengli ZHANG**
File #: A 75-983-726-Boston

Part B, Item 1.A. Attachment:

    Applicant Shengli Zhang, born in Tianjin, China near Beijing, on March 4, 1954,
has demonstrated a lifetime commitment toward freedom and democracy, which has
resulted in his persecution, imprisonment and torture by the government of the Peoples
Republic of China. As a youth, after graduating from school in 1970, he was assigned a
job as a machinist in a local factory. At this time during the Cultural Revolution,1 when
all the universities were closed and citizens were forced to labor on farm collectives, the
government assigned Mr. Zhang to work as a machinist in a local factory, an extremely
desirable position for a young man. At the age of 22 in 1976, Mr. Zhang was promoted
to the local city's Bureau of Transportation and Transit. Within a year, however, Mr.
Zhang was demoted back to his former factory position when the communist government
found that his political viewpoints were not in line with the official propaganda
guidelines. Over the subsequent years, Mr. Zhang educated himself about democracy,
human rights, capitalism and freedom and hatched a plan to escape to the west and
eventually bring these western values to China.

    Shengli Zhang began his quest for freedom and democracy at the age of 27 at
9:00 P.M. in August 1981, by climbing over the wall of the British Embassy. Mr.
Zhang's request for asylum was not accepted and he was driven in the middle of the night
by the embassy staff to a quiet Beijing neighborhood. Mr. Zhang's actions were
apparently not discovered.

    Then, almost a year later on April 17, 1982, Mr. Zhang made a similar attempt,
this time at the U.S. Embassy, taking his diaries and writings on the Chinese government
and claiming political asylum. The Peking, China section of the U.P.I. news service and
Reuters news service reported on the incident. See Exhibit No. 2.

    This time, the Chinese government had discovered his actions and
demanded his return. Because the State Department feared that Mr. Zhang's
actions would worsen already difficult international relations concerning Taiwan,
it ordered the diplomatic official at the U.S. Embassy, Charles M. Martin,2 to
deliver him to Chinese authorities. See Exhibit No. 3.

    Mr. Zhang was immediately arrested by the Chinese police and jailed in a Beijing
detention facility. He was "interrogated"3 by the police for 49 days. The Chinese

---

1 See State Department Report ("The Cultural Revolution period, 1966-1976, was one of
sustained political and economical upheaval during which millions of citizens across the country
were brutalized arbitrarily.").
2 Then, First Secretary of the Political Section of the U.S. Embassy in Beijing, China. Mr. Martin left the
State Department in 1988. Currently, he is Vice-President of Corporate Communications for Asia-Pacific
at the Monsanto Company.
3 See Part B Item 2. for a description of Mr. Zhang's interrogation and imprisonment at the hands of
Chinese government authorities at a labor camp.

Form I-589: APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF
DEPORTATION
Applicant: **Shengli ZHANG**
File #: A 75-983-726-Boston

Part B, Item 1.A. Attachment (cont.):

Government granted Mr. Zhang no rights and there was no trial, sentencing him to two
years forced labor.4

    A year after his attempt for freedom, Mr. Zhang escaped from the
Reformation Farm and hid for 20 days in an underground hotel, while attempting
to contact the U.S. Embassy.  During this period, Mr. Zhang's parents were also
interrogated and threatened many times.  He was finally caught by the Chinese
authorities and jailed in various facilities.

    In December 1983, Mr. Zhang was indicted and on July 1, 1984, Mr. Zhang was
convicted of "counter-communist behaviors" and "insisting on [his] counter-communist
view" and sentenced to two additional years (for a total of four years) imprisonment at
the Department of Correction Through Hard Labor Xinjiang Production and Construction
Corps.5

    Over four years after his attempt to defect to the U.S., Mr. Zhang was released
from prison on June 2, 1986.

    After his release from hard labor camp described in Part B, Items 1.A. and 2,
Zhang continued to be persecuted at the hands of the Chinese government.  As described
by Mr. Zhang:

    I was released on June 2, 1986.  I went back to Tianjin and found that the
    government had removed my household registration as a resident in Tianjin.
    I therefore could not find a job and had no access to any social assistance.
    The life was sad and hard, no better than prison.  The worst nightmare was
    that I had to report to the public security bureau twice every month for the
    first five years, reporting to them what I had done and how I had changed by
    political opinion.  Thereafter, I was required to report to them once every
    month until the day when I left China.  The police frequently visited my
    neighbors to investigate my behavior such as where I had gone, what I had
    been doing, and what kind of persons I had contacted with.  This had been a
    psychological torture for the past eleven years.

    After Mr. Zhang's release, he returned home to his mother's house, whereupon
policemen took him to the police station to ask about his past, fingerprint him, and
threaten him, warning that Mr. Zhang "should behave very carefully and never dare to

---

4 An official Chinese Government document describing the later modification of Mr. Zhang's
sentence was submitted, <u>see</u> Exhibit No. 4.  An official Chinese Government document describing
Mr. Zhang's release from prison was submitted, <u>see</u> Exhibit 5.
5  Exhibit No. 4.

Form I-589: APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF
DEPORTATION
Applicant: **Shengli ZHANG**
File #: A 75-983-726-Boston

Part B, Item 1.A. Attachment (cont.):

overstep [his] boundary (sic)." And that, "If they ever find [Mr. Zhang] doing anything
to the contrary to the society, they will, they will put [Mr. Zhang] under immediate
arrest." The police asked Mr. Zhang's neighbors to keep a close watch over him. Mr.
Zhang was required to attend the regular Chinese Communist Party's political
indoctrination meetings.

Mr. Zhang was continually threatened and reminded that he should never again
advocate for democracy, a counter-communist viewpoint, or otherwise agitate the
government. He was continually persecuted in other ways by an authoritarian
government that controls virtually every aspect of daily life. Zhang could not receive
further education because it was controlled by the government. Zhang could not receive
a decent job, since all jobs were in some way controlled by the communist government.
Zhang even had difficulty with many aspects of routine family life, since many family
issues, such as marriage and children, were controlled by the communist government.

Part B, Item 1.B. Attachment:

Zhang greatly fears harm that would come to him should he be returned to his
home country. Please see Part B, Items 1.A. and 2 for the past harm that has occurred to
him.

Mr. Zhang was continually threatened and reminded that he should never again
advocate democracy, a counter-communist viewpoint, or otherwise agitate the
government.

The first sentence of a related opinion in the U.S. Court of Appeals for the First
Circuit, one of the highest courts in the U.S., stated:

"Zhang is a promoter of democracy in his native land of China."6

Since his arrival in the U.S. when he applied for asylum, Mr. Zhang's actions
bring him in direct and prominent violation of the Chinese government's laws and
explicit directions and threats. Since Mr. Zhang's arrival in the U.S., he has dedicated
himself to his original proposition, seeking freedom and democracy for himself and his
fellow Chinese citizens. Mr. Zhang became involved with an organization called The
Party for Freedom and Democracy in China and organized and participated in several
protests, including protests near the Chinese Embassy in Washington, D.C., the Chinese
Consulate General in New York City, and the White House. These protests were
recorded on videotape by Chinese authorities.7 The World Journal, the largest Chinese

6 Zhang v. Immigration and Naturalization Service, 348 F.3d 289 (1st Cir. 2003).
7 Eight Individuals Protest at Performance of China's Central Ensemble, The World Journal (September 8,
2000)(naming "Zhang Shengli" as one of the eight "activists" and including a group photograph of the

3

Form I-589:  APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF
DEPORTATION
Applicant:  **Shengli ZHANG**
File #: A 75-983-726-Boston

Part B, Item 1.B. Attachment (cont):

language newspaper, carried the story of the White House protest, for which Mr. Zhang
played a prominent role, on its front-page headline.  Radio Free Asia, created by
Congress for broadcasting messages of freedom and democracy into China, broadcast the
protest live to its audience in mainland China.

Also since Mr. Zhang's arrival in the U.S, a Chinese police officer has several
times gone to Mr. Zhang's home in China and interrogated Mr. Zhang's wife.  The
Chinese authorities confiscated all letters that Mr. Zhang wrote to his wife and asked her
to tell him to come back to China immediately.

Since the People's Republic of China released Mr. Zhang from prison, the
communist government has only become more obsessed about suppressing dissenters,
especially those espousing the principles of freedom and democracy.8  In recent years,
the Chinese government has arrested mothers and babies, American citizens and legal
Chinese-American emigrants and immigrants under a variety of political pretexts and
subjected them to long periods of interrogation and detention.9  The U.S. State

---

eight).
8 See China: Profile of Asylum Claims and Country Conditions, U.S. Department of State (April 14, 1998).

> The People's Republic of China (PRC) is an authoritarian state in which the Chinese
> Communist Party (CCP) is the paramount source of power.  Leaders stress the need to
> maintain stability and social order and are committed to perpetuating the rule of the CCP
> and its hierarchy. . . .
>
> The security apparatus is composed of the Ministries of State Security and Public
> Security, the People's Armed Police, the People's Liberation Army, and the state judicial,
> prosecutorial, and penal systems.  The security forces are responsible for numerous
> human rights abuses.
> . . . .
> Claims Based on Political Opinion
> [T]he Government continues to commit widespread and well-documented human rights
> abuses, in violation of internationally accepted norms, stemming both from the
> authorities' intolerance of dissent and fear of unrest, and the limited scope or inadequate
> implementation of laws that protect basic freedoms.  Abuses include arbitrary arrest and
> lengthy incommunicado detention, forced confessions, torture, and mistreatment of
> prisoners.  A 1995 law raised the number of capital offenses from 26 to 65 [and] China
> sentenced more than 6,100 convicts to death and carried out 4,367 executions.
> . . . .
> [Although t]he Government released a few political prisoners on medical parole or before
> their terms were over[, t]housands of others [] remain in prison for the peaceful
> expression of their political, social, or religious views.

9 See Proposed Senate Resolution Urges China to Release Li Shaomin, Senate Resolution 128, located at
http://usembassy.state.gov/posts/ja1/wwwhgl0077.html (July 11, 2001).

> Whereas in recent months the Government of the People's Republic of China has arrested
> and detained several scholars and intellectuals of Chinese ancestry with ties to the United

4

Form I-589: APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF
DEPORTATION
Applicant: **Shengli ZHANG**
File #: A 75-983-726-Boston

Part B, Item 1.B. Attachment (cont):

Department states that "Arbitrary detention, torture, and extrajudicial killings remained
common tools of political and religious repression. Public security forces all too
frequently tortured detainees in China."10  Just recently, The Washington Post reported,
see A Study Group Is Crushed in China's Grip, The Washington Post, at A01 (Apr. 23,
2004), on the extensive persecution and imprisonment of a student study group in China
that did nothing more than privately discuss "expanding the level of freedom in society
through reform" and democratic reform of the Chinese Communist Party.  The article
reported that, "What happened to the [student democracy group] offers a glimpse into the
methods the party uses to maintain its monopoly on power . . . ."  One of the students was
visited by his wife for the first time after being imprisoned for three years with no end in
sight.  They talked through phones.  "His head had been shaved, and he was thin and
pale. . . . After only 20 minutes, the telephone line went dead.  Their time was up."

Because Mr. Zhang has renewed his individual quest for freedom and democracy,
because he has expressly violated official Chinese government orders and policy, because
his case is well known in the immigrant community, because Mr. Zhang has assisted
prominent U.S. groups who advocate freedom and democracy in China, because his case
has received national and international press coverage, and because one of the highest
courts in the U.S. has recognized the Chinese government's past persecution of him, the
Chinese authorities are likely to renew their persecution, torture and imprisonment of Mr.
Zhang should he be returned to China.

Part B, Item 2. Attachment:

### Shengli Zhang's Statement of Imprisonment and Torture

Mr. Zhang was regularly "interrogated" by the Chinese communist government at
various times during his four-year ordeal.  This "interrogation" would consist of being
beaten with sticks and other objects and tortured with electric prongs.  Three times he
was beaten so badly that 80% of his body turned black and blue.

Mr. Zhang describes his ordeal at the Shuangkou Forced Labor Reformation Farm,
where he would ultimately be imprisoned for one year:

In the Farm, there was a small jail with one large room 54ft long and 14 ft
wide. Outside of this jail room was a high wall with razor-sharp wire mesh.
Outside of this jail room was a hallway connected to a guard's room, with
all kinds of torture instruments hanging on its walls, including electric

---

States, including at least 2 United States citizens and 3 permanent residents of the United
States.
10 Introduction to Country Reports on Human Rights Practices, U.S. Department of State, located at
http://usembassy.state.gov/posts/pk1/wwwh02030507.html (March 05, 2002).

Form I-589: APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF
DEPORTATION
Applicant: **Shengli ZHANG**
File #: A 75-983-726-Boston

<u>Part B, Item 2. Attachment (cont)</u>:

baton, high chair, thick ropes, leather whips, leg irons, and hand cuffs,
etc... On the other side of the hallway were 10 small isolation cells, each
9ft long and 4ft wide. In each of the cell, there were two small stools. A
few pieces of planks lay on top of the stools, which was where the
prisoner would sleep. In each cell is a small bucket, which was the only
place a prisoner could relieve himself as a toilet. There was an iron door to
each of the cell, with a small peek hole where the guards could look into
the cell. This peek hole was the only opening for air in the cell.
Before prisoners were put into these isolation cells, they were all severely
beaten. I was no exception.

Mr. Zhang describes his ordeal after being captured following his escape from the
Shuangkou Forced Labor Reformation Farm:

After my escape, I was re-arrested on April 25, 1983 in Beijing. On May
10th, I was transferred to Tienjing. On June 10th, I was taken back to the
Labor Reform Farm.

Two guards told me to bend over in a 90 degree angle, with arms dangling
downward. I found that blood rushed to my head, and I was feeling dizzy
and seeing stars. In 20 minutes, I keeled over. As soon as I fell, the guard
rushed forward to tie me up with electric wire. They took my shoes off,
and began prodding the soles of my feet with an electric baton. Then they
put both my hands and feet in hand cuffs and leg irons, and began beating
me with both whips and electric baton on my head, back, torso, arms, and
legs. In ten minutes, blood began to ooze out of my face, eyes, nose, and
mouth. As they beat me, they shouted at me: "This is for daring to
escape." After ten minutes of really hard beating, they picked me up and
instructed me to take the 90 degree bend position again. I keeled over in
only a few minutes, and they began to beat me up all over again. This was
repeated, until I could no longer stand up, which was nearly an hour and a
half of beating. Then they put me into a small cell.

Two meals were given to me each day, once in the morning, and once at
night. It was summer, the room was very hot. No air at all, since there
was only the peek hole; but the room was thick with mosquitoes, flies and
gnats, as they breed in the toilet bucket, which was next to the sleeping
planks. The insects screeched and dived around the room, and bit into my
open wounds continuously. After two weeks, with no sleep and constant
pain, I was near death. On June 25th, I was rushed into a hospital. I was
finally taken off the critical list after one week of treatment.

Form I-589:  APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF
DEPORTATION
Applicant:  **Shengli ZHANG**
File #: A 75-983-726-Boston

Part B, Item 2. Attachment (cont):

On July 2, 1983, while I was still ill in the hospital after being severely
beaten by the guards, I was re-arrested by the Public Security Bureau of
Tienjing.  [Editor's note: the Tienjing Public Security Bureau specialized
in political investigations.]  I was kept in Tienjing's detention center for
one year awaiting sentence from the Court.  On July, 1984, I was given a
sentence of three year hard labor for "seeking out an enemy country."

Mr. Zhang describes his imprisonment at the Department of Correction Through
Hard Labor Xinjiang Production and Construction Corps:

In August, 1984, I was sent to Xinjiang.

Xinjiang is mostly a desert, with harsh weather, and was very sparsely
populated.  The Chinese Communists use it the way the Soviets did with
Siberia - they like to send their prisoners to Xinjiang.

The train taking prisoner to Xinjiang was a special train.  It was full of
military police holding bayoneted guns walking up and down the aisle.
Every entrance to the train was guard by a military policeman with a
machine gun.  All the windows were sealed, with iron bars on the outside.

After I was taken on the train, I was handcuffed, and chained with leg
irons.  In the train, only I was chained, because I was a political prisoner.
For the five days and four nights journey to Xinjiang, my leg irons were
never taken off once.  Only one hand cuff was taken off when I needed to
use the toilet.  The freed hand cuff was then chained to a bar in the toilet,
and put back on my hand when I finished.  Both of my feet lost their
feelings completely.  When they took my leg irons off when we arrived, I
tried to walk off the train, but I fell and rolled down the steps.  I simply
could not stand up. In the end, the two military police dragged me to the
waiting bus.

The two years in Xinjiang, I did hard labor.  During the summers, I
worked on wild land preparing it for farming. I dug canals, and irrigation
trenches.  I planted wheat.  During the winters, I gathered fire wood, fell
trees, and made bricks.  Temperature can drop down to 20 degrees below
freezing.  We never have enough clothes, and we carried all the loads,
including firewood, on our backs.  If the guards felt we were not working
hard enough, they would beat us with electric batons.  Beating is routine
and often.  Our days started at sun rise, and end at sun down.  Each
morning when we filed out to work, armed military police would always
accompany us.  At the designated work area, each prisoner would work

Form I-589: APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF
DEPORTATION
Applicant: **Shengli ZHANG**
File #: A 75-983-726-Boston

Part B, Item 2. Attachment (cont):

       only in an area defined by chalked lines. If a prisoner were to leave that
       defined area, the military police would open fire. Some prisoners died this
       way. For two years, every day was the same for me.

Part C, Item 1. Attachment:

       Mr. Zhang applied for asylum before. The final status of the application was that
the U.S. Court of Appeals for the First Circuit factually determined that Zhang had been
imprisoned by the Chinese government for four (4) years in hard labor for "counter-
communist behaviors." The Court, however, denied Mr. Zhang's appeal of his Motion to
Reopen and Reconsider on complex legal procedural grounds. In summary, Mr. Zhang
had not timely appealed the original Immigration Judge's finding (because Zhang had not
found required evidence) and thus her decision could not be reviewed in a Motion to
Reopen and Reconsider. In oral arguments, under questioning by the U.S. Court of
Appeals judges, the Department of Justice attorney admitted that if Mr. Zhang had timely
appealed the original decision, based on the new evidence that Zhang presented in his
Motion to Reopen and Reconsider, the court would have legally found in his favor. It is
this new evidence and the Court's factual determination that are the basis for Mr. Zhang's
current application.

Part C, Item 4. Attachment:

       Since Zhang came to the U.S. and applied for asylum, he did not leave the U.S.
However, Zhang originally came to the U.S. on a visa on 8/3/1996 and left on 8/13/1996
seeking assistance with the U.S. government and an attorney. After going to the FBI and
the INS offices in San Francisco, Mr. Zhang did not receive assistance due to translation
problems, and a San Francisco attorney advised Mr. Zhang that he would need to obtain
evidence by locating U.S. Embassy personnel, specifically Charles Martin. Aware of
Chinese government procedures and monitoring, wherein he was required to report once
a month, Zhang returned believing that a ten (10) day leave of absence traveling and his
intent of applying for asylum would be undiscovered by the Chinese government
authorities. After four (4) years of torturing and imprisoning Mr. Zhang and another
decade repressing and threatening him for trying to leave China, the Chinese authorities
were not on the lookout or even suspicious of his return _to_ China. On March 12, 1997,
Mr. Zhang again came to the U.S. On February 2, 1998, Shengli Zhang applied for
asylum with the INS's Boston office.

Form I-589:  APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF
DEPORTATION
Applicant:  **Shengli ZHANG**
File #: A 75-983-726-Boston

LIST OF EXHIBITS

Exhibit No.

1.  Sworn Statement of Shengli Zhang, February 13, 1998.

2.  Chinese Man Jumps U.S. Embassy Wall, U.P.I. Peking (April 17, 1982); Reuters
North European Service (April 17, 2004).

3.  Sworn Testimony of Charles M. Martin, May 31, 2002; Photographs documenting the
reunion.

4.  Verdict of Extending Laogai, The Office of Tian Jing Correction Through Laogai,
July 1, 1984.

5.  Certification of Release, Department of Correction Through Hard Labor, June 1, 1986.

## SWORN STATEMENT OF SHENGLI ZHANG

1.     I was born on March 4, 1954 in Tianjin, China. I graduated from middle school in 1970 during the Cultural Revolution. Thereafter, I was assigned a job as a machinist in a local factory.[1]

2.     As a youth educated by the communist system, I spent most of my spare time to study political theories including those of Marx and Lenin. I read political textbooks published by the Soviet Union; I also studied classical works of 19th century European philosophers and political economists. I had also developed a love for Chinese classic literature and history as well as Chinese philosophy. Looking back, this period of about 5-6 years' study and learning was the initial stage of formation of my political outlook and position which subsequently led to my twice-arrest, four-year imprisonment, and fifteen-year persecution by the Chinese authority.

3.     In or about 1976, I was transferred to Propaganda Department of Tianjin Municipal Bureau of Transportation and Transit which was considered a promotion by many. Within a year, I was transferred back to the same job in the same factory because of my political viewpoints which were not considered in line with the official propaganda guidelines.

4.     Thereafter, I found myself spending more time in library (on sick leaves) studying European history, American history and other works I found stimulating to my intellectual development. From 1979, I moved to Beijing (My father and grandparents were living in Beijing, about one-hour train ride from Tianjin.) and continued my full-time study in Beijing Library (It had more western works.) With the maturity of my political standing, I realized that Chinese government was a dictatorship, even though it claimed itself as "democratic dictatorship," that Chinese people had no political freedom, no human rights and they were living virtually in a big jail, that one-party dictatorship would never deliver democracy, that socialism was nothing but a product of 19th century European utopia, that communism was anti-human being and anti-nature animal, and that only democracy and private ownership could save China.

5.     With these elevation of my political ideals and facing the reality in Beijing and in China, I made a decision of my next move – escape to the west, study western democracy, and form a democratic party to challenge the Communist rule in China. The thought was painful, because I had to leave my parents behind, perhaps I would never be able to seen them again; yet the reality was even more painful. I had to go.

6.     I studied several options to carry out my plan and finally decided to seek political asylum from foreign embassies in Beijing. One evening in or about August, 1981, I climbed over the wall of British Embassy at about 9:00 pm. However, my request for asylum was not accepted and I was driven by an embassy staff to a quite Beijing neighborhood in the middle of the night.

7.     On April 17, 1982 (Saturday), after a period of preparation for my next move, I climbed over the wall of American Embassy in Beijing, China. On that day, Ambassador Arthur Hummel was not in the embassy. I was received by a senior American diplomatic officer who introduced

---

[1] During the Cultural Revolution, universities were all closed down. I was one of the fortunate who were not forced to labor on the farms.

himself Mr. Li Ma (_____ hin    name). I explained to him that he ____ g political asylum from the United States ____ rnment. Mr. Ma said that I could go abro ____ responded that China was like a huge jail and that there was no way I could go abroad by myself.

8.    I explained to Mr. Ma in detail my political opinion of the Chinese authority including its political system, diplomacy, economy, and ideology. Mr. Ma said he would send me a safer place because it was dangerous staying in the embassy (Mr. Ma gave me his home telephone number.)

9.    At this moment, we were notified that the *Chargé de' affaires ad interim* of the U.S. Embassy was on the phone. After talking over the phone with *Chargé de' affaires ad interim*, Mr. Ma told me that the "Communist" Foreign Ministry had learned that I was inside the embassy and that they had made a demand to *Chargé de' affaires ad interim* for delivering me back to them. I explained to *Chargé de' affaires ad interim* over the phone of the purpose of my entering the embassy. He refused my request. He stated that he did not want this incident to worsen the relationship between the United States and China.[2] Mr. Ma said that the embassy had already been surrounded by the Chinese police. *Chargé de' affaires ad interim* was on the phone again, ordering Mr. Ma to send me out. Mr. Ma telephoned both the British and Greek embassies for assistance, hoping they might be able to get me out to a safe place. However, neither British nor Greek embassies wanted to get involved. More telephone calls from *Chargé de' affaires ad interim*, Mr. Ma had no choice but to send me away. Before he drove me out, Mr. Ma told me that I should make a statement to the police that the purpose of my visit to the American Embassy was to discuss the possibility of studying overseas and that there was no political purposes involved. To play safe, Mr. Ma also asked me to leave my diaries and my other writings on Chinese government in the embassy.

10.    As soon as I got out of the entrance of the embassy, I was arrested by the police and jailed in the detention facility of Beijing Public Security Bureau. I was interrogated by the police for consecutive 49 days until June 6 when I was transferred to Tianjin Public Security Bureau which had the jurisdiction of my place of residence. Official decision came down one month after further interrogation in Tianjin. I was given the penalty of two years' forced labor reformation for my "defection to the U.S. Embassy." The place for forced labor reformation was Shuangkou Forced Labor Reformation Farm situated in the northern suburb of Tianjin.

11.    On April 5, 1983, I escaped from the forced labor reformation farm and went to Beijing. I stayed for 20 days in a underground hotel of Beijing Dabeiyao Hospital, trying to contact U.S. Embassy. I was caught again by the authority on April 25, 1983. After about two weeks' detention in Beijing I was escorted back to Tianjin by Tianjin Public Security Bureau and detained in Tianjin North Station Detention Facility. On June 10, 1983, I was transferred to the same forced labor reformation farm. On June 25, 1983, I was sent Tianjin Prison Hospital for treatment.

12.    I was formally arrested on July 2, 1983 pending indictment. In or about December, 1983, Tianjin People's Prosecutorial Office formally indicted me as both "attempting to overthrow the Communist rule, the socialist system and the proletarian dictatorship, and betrayal and defecting."

13.    In or about February, 1984, Tianjin People's Intermediate Court tried my case. The court decided that I was guilty of "betrayal and defecting to enemy" and sentenced me to three years'

---

[2] The relationship between the United States and China was in the lowest because of the recent sale of arms by the U.S. to Taiwan.

located in Xinjian,    ut 4,0 0 miles northwest of Tianjin, the    eri   of China.

14.     My parents later told me that they were interrogated and threatened many times by the police from both Beijing and Tianjin Public Security Bureau after I escaped from the forced labor reformation farm in April, 1983, that police was there everyday on three shifts, and that the U.S. Embassy was surrounded by plain-clothed police for many days before I was caught.

15.     I was released on June 2, 1986. I went back to Tianjin and found that the government had removed my household registration as a resident in Tianjin. I therefore could not find a job and had no access to any social assistance. The life was sad and hard, no better than prison. The worst nightmare was that I had to report to the public security bureau twice every month for the first five years, reporting to them what I had done and how I had changed my political pinion. Thereafter, I was required to report to them once every month until the day when I left China. The police frequently visited my neighbors to investigate my behavior such as where I had gone, what I had been doing, and what kind of persons I had contacted with. This had been a psychological torture for the past eleven years.

16.     I could not tolerate it any longer. With the help of my relative/friend, I came to the United States in August, 1996, seeking political asylum. I went to FBI; I went to INS, both in San Francisco. Nobody seemed to be able to help me with my limited knowledge of English. I met an attorney, Mr. Wu, and he asked to call other lawyers. The worst thing was that I did not have any idea as how to find Mr. Ma (I do not know his American name) to substantiate my story. For ten days, I ran out of my money and had no place to stay. I had no choice but to return to China. Fortunately, no one knew that I had been absent.

17.     In March, 1997, again with the help of my friend, I came to the United States in B-1 status, seeking political asylum. I was still very hopeful that I might be able to find someone who would help me file my asylum case. In May 1997, however, my request for assistance was turned down by the Greater Boston Legal Services.

18.     According to my wife, Mr. Chunli Li, a police officer from Tianjin Public Security Bureau has bee in my house several times since I left in March 1997. For some reason, they know I am now in the United States. They wanted to know when I plan to go back to China.

SWORN under pains and penalties of perjury this 13th day of February, 1998.

*Sheng Shong Li*

Shengli Zhang

SWORN to before me under oath this
13th day of February, 1998.

Notary Public
My commission expires at 12/06/02

WEI JIA
Notary Public
My Commission Expires December 6, 2002

RECEIVED
DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

2002 APR 29 P 4: 36

BOARD OF
IMMIGRATION APPEALS
OFFICE OF THE CLERK

000321

LEVEL 1 - 4 OF 4 STORIES

Copyright 1982 U.P.I.

April 17, 1982, Saturday, PM cycle

SECTION: International

LENGTH: 165 words

HEADLINE: Chinese man jumps U.S. embassy wall

DATELINE: PEKING

BODY:

A Chinese man seeking to emigrate jumped over a wall of the U.S. Embassy today and met with American officials before voluntarily surrendering to Chinese authorities, an embassy spokesman said.

The embassy declined to release the identity of the man and a Chinese government spokesman did not have any immediate information on the incident.

An embassy spokesman said the man climbed over the wall surrounding the embassy compound at about noon.

''Entry was observed by Chinese authorities and he left the U.S. embassy compound shortly afterwards and turned himself in to Chinese officials who had expressed concern about the possibility that he might be a threat to American embassy oficials,'' the spokesman said.

''At no time was he a threat and the embassy informed Chinese authorities of that,'' the spokesman said.

The spokesman said the meeting with U.S. officials lasted about two and a half hours over a visa problem but no details were given on the man's case.

LANGUAGE: ENGLISH

6

000265

LEVEL 1 - 2 OF 4 STORIES

Copyright 1982 Reuters, Ltd.
Reuters North European Service

APRIL 17, 1982, SATURDAY

LENGTH: 173 words

DATELINE: PEKING, APRIL 17

BODY:
A CHINESE MAN SCALED THE WALL OF THE U.S. EMBASSY IN PEKING TODAY BUT AFTER TWO HOURS OF TALKS WITH DIPLOMATS LEFT VOLUNTARILY AND GAVE HIMSELF UP TO POLICE, AN EMBASSY SPOKESMAN SAID.

THE SPOKESMAN SAID HE WAS DISCUSSING AN UNSPECIFIED VISA PROBLEM.    THIS SUGGESTED THAT HE MAY HAVE WANTED TO EMIGRATE TO THE UNITED STATES.

"HE VOLUNTARILY LEFT THE EMBASSY SHORTLY AFTER 2 P.M. AND TURNED HIMSELF OVER TO CHINESE SECURITY MEN WHO HAD EXPRESSED CONCERN ABOUT THE POSSIBILITY THAT HE MIGHT BE A THREAT TO EMBASSY OFFICIALS," THE SPOKESMAN SAID.

"AT NO TIME WAS HE A THREAT, AND THE EMBASSY SO INFORMED THE CHINESE AUTHORITIES," HE ADDED. IT WAS NOT KNOWN WHETHER THE MAN WOULD FACE CHARGES.

WHILE THE MAN WAS INSIDE, ABOUT TWO DOZEN SOLDIERS AND PUBLIC SECURITY MEN WERE POSTED OUTSIDE THE COMPOUND, WHICH IS USUALLY GUARDED BY A HANDFUL OF PEOPLE'S LIBERATION ARMY (PLA) TROOPS.

THE INCIDENT DEMONSTRATED THE DIFFICULTIES EXPERIENCED BY ORDINARY CHINESE WHO WANT TO MAKE CONTACT WITH FOREIGN EMBASSIES BUT HAVE NOT BEEN AUTHORISED TO DO SO.

LANGUAGE: ENGLISH

8

000267

## SWORN TESTIMONY OF CHARLES M. MARTIN

I, Charles M. Martin, hereby testify to the following facts:

1. I am currently the Vice-President of Corporate Communications for Asia-Pacific at the Monsanto Company, a large U.S.-based biotechnology firm. From August 1980 until August 1982, I served as the First Secretary in the Political Section of the United States Embassy in Beijing, People's Republic of China.

2. On Saturday, April 17, 1982, I met the asylum applicant, ShengLi Zhang, after he scaled the walls of the American embassy. Although the incident happened 20 years ago, I remember the details very clearly because the incident took up the whole day and was very intense. After Mr. Zhang jumped over the embassy wall, he was met by a senior diplomatic officer, who escorted him to the Economic Section at the rear of the Embassy compound. I spoke with Mr. Zhang for about an hour. He explained to me that the Chinese government had persecuted him on account of his political opinions and that he jumped over the American embassy wall to seek political asylum from the United States government. He told me that he had studied Western democratic principles extensively and that he was firmly against the autocratic way in which the Communist Party ruled China. He indicated that he wanted to go to the United States to learn more about the functioning of a multiple party political system and to work toward the institution of a democratic system in China. He also gave me several of his notebooks and journals, in which he had written about his pro-democracy/anti-Communist political ideas. I told him that he could only seek political asylum once he was outside of China and that he should try to find another way to go abroad. He responded that there was no way that a common Chinese man like himself could go abroad. I told him that I would first try to arrange to send him to a safer location because it was dangerous for him to remain in the embassy. I also gave him my phone number, which he wrote on his arm.

3. Several minutes later I received a phone call from the Charge de affairs, Charles Freeman. He told me that the Chinese Foreign Ministry knew that Mr. Zhang was inside the embassy and that the Ministry demanded that the American embassy officials hand Mr. Zhang over to the police. Mr. Freeman also told me that the Chinese police had already surrounded the embassy. I told Mr. Freeman Mr. Zhang's reasons for jumping over the embassy wall and he responded that the embassy could not help Mr. Zhang because the relationship between the United States and China was already very tense (due to the United States' sale of arms to Taiwan) and retaining Mr. Zhang would only worsen the relationship. Mr. Freeman told me that I must make sure that Mr. Zhang left immediately.

4. After I got off the phone with Mr. Freeman, I sat down with Mr. Zhang and discussed different ideas for him leaving the embassy safely and avoiding arrest. I phoned the British embassy and asked the officials to drive a car to our embassy and escort Mr. Zhang outside the embassy compound. However, the British embassy refused to get involved. Then I called the Greek embassy, which was located right nextdoor to our embassy, and asked the officials there if they either could come to the American embassy

000007

with a car and drive Mr. Zhang outside the compound, or if they could allow him to jump over the wall between the U.S. and Greek embassies and then drive him out with a car. However, the Greek embassy also didn't want to get involved.

5. Mr. Freeman continued to call me and demand that I send Mr. Zhang away. I had already exhausted all the possibilities for Mr. Zhang leaving the embassy compound without being noticed by police, so my only alternative was to have one of our chauffeurs drive Mr. Zhang out in an embassy vehicle and prepare for the fact that he was going to have to face the police. Before Mr. Zhang got into the car, I advised him to tell the police that he had not entered the American embassy for any political reason, but only to seek opportunities for studying in the United States. I figured that if he could fashion a non-political reason, they would go easier on him. I also told him that I would send a letter of protest to the Chinese Foreign Ministry for responding to the incident in the way it had. Once the car got outside the embassy compound, I saw the police arrest Mr. Zhang.

6. Later in the day I wrote a report for the U.S. State Department on the entire incident. I have thought about Mr. Zhang often since that day. I was reunited with him after 20 years on May 1, 2002 at my office in Washington, DC. Kathy Polias, a Georgetown University law student who is helping Mr. Zhang with his case, was able to find me by doing several internet searches. Because Mr. Zhang and his previous lawyer had had so much difficulty finding me through the U.S. State Department (which I left in 1988), Ms. Polias figured that I was working in the private sector and luckily found an article on the internet about Monsanto, in which I was quoted.

7. I ask that the Board of Immigration Appeals grant Mr. Zhang political asylum because he has already been persecuted in the past on account of his allegiance to American ideals, and his protest activities since arriving in the United States would put him in even greater risk of persecution, should he be forced to return to China. Thank you for your time and consideration.

Signed,

*Charles M. Martin*
Charles M. Martin
Monsanto Company
600 13th St., NW
Suite 660
Washington, DC
(202)383-2851

May 31, 2002

District of Columbia                         ss:

Subscribed and sworn to before me this
____ day of _____, 20__
Emma Y. Lee,, Notary Public
My Commission Expires February 14, _____

MONSANTO

Charles M.Martin
Vice President
Corporate Communications
Asia Pacific Monsanto Company

MONSANTO COMPANY
600 13TH STREET, N.W.
SUITE 660
WASHINGTON, D.C. 20008
PHONE (202) 383-2851
FAX (202) 783-0382
CELLULAR (202) 262-2976
charles.m.martin@monsanto.com

000008





On May 1, 2002, I was reunited with Charles M. Martin (left), who was the First Secretary in the Political Section of the United States Embassy in Beijing, China, in April 1982, when I scaled the walls of the American embassy.  We were reunited after 20 years at the Washington, DC office of the Monsanto Company, where he holds to the position of Vice-President of Corporate Communications for Asia-Pacific.

000009



During my meeting with Mr. Martin in DC, we discussed what my life has been like since April 17, 1982- and the persecution I have faced because of my political opinions.

# THE OFFICE OF TIAN JING CORRECTION THROUGH LAOGAI

## VERDICT OF EXTENDING LAOGAI

July 1, 1984

Due to counter-communist behaviors, Sheng-li Zhang, a prisoner, was sent to the Laogai Camp on July 7th, 1982 for two years; now Sheng-li Zhang's Laogai term is extending for two years (from July 7th, 1984 to July 6th, 1986) again by his insisting on counter-communist view.



<u>CERTIFIED TRANSLATION</u>

**Certification of Release**

Person Released:

Name: Shengli Zhang          Sex: Male

Date of birth: 03/04/54

Imprisonment Imposed:

from 07/02/83 to 07/01/86

Crime Convicted:

Betrayal and Defecting to Enemy

Issuing Agency:

Department of Correction through Hard Labor
Xinjiang Production and Construction Corps
No. 2 Division for Agriculture (seal)
06/01/86

Notes:

Released with 30-day reduction

-------------------------------------------------------

I, the undersigned, hereby certify that I am capable
of translating the within document from Chinese
into English and that the above translation is
accurate and complete to the best of my knowledge.

Hongli Lu

SWORN to under oath before me this 20th
day of September, 1998.

Notary Public
My commission expires:

WEI JIA
Notary Public
My Commission Expires December 8, 2002

— 1 —

# BREITBART.COM

JUST THE NEWS...

Google™ [                    ] ( Search Web )    [                    ]

SOURCE:   ASSOCIATED PRESS · AFP · DRUDGE REPORT

❮ NEWS:  BREAKING · WORLD · US · POL · BIZ · ENT · LIFE · SCI · ODD · SPORTS



## RESCUE ALERT - MEDICAL ALARM SYSTEMS
(www.rescuealert.com)
Quality medical alarm systems starting at $19.95 per month. Nationwide monitoring and manufacturing experience of 19 years. Response Center is EMD trained. Peace of mind for your loved ones.

## China imposing 'very repressive' policies in Tibet: Dalai Lama
Nov 08 11:11 AM US/Eastern

✉ Email this story

Tibet's spiritual leader the Dalai Lama accused the Chinese authorities of imposing "very, very repressive" policies in his Himalayan territory.

Speaking ahead of his meeting with US President George W. Bush, the Dalai Lama charged that China pursued strict rule in the Tibetan Autonomous Region despite "some progress" in direct talks between his envoys and Beijing to resolve the Tibetan issue.



"Still, things are very, very repressive," he told reporters before attending a dialogue in Washington with scientists, physicians and psychologists on the role of meditative practices in medical treatment and healing.

The Dalai Lama's meeting with Bush is expected to take place this week during his high-profile 10-day visit to Washington following his Monday arrival, sources said.

Lodi Gyaltsen Gyari, the 70-year-old Dalai Lama's special envoy, said the Tibetan leader would appeal to Bush to prod Chinese leader Hu Jintao during their meeting in Beijing later this month to give "genuine autonomy" to the Himalayan territory.

Bush's previous two meetings with the Dalai Lama at the White House residence drew angry complaints from China.

Copyright AFP 2005, AFP stories and photos shall not be published, broadcast, rewritten for broadcast or publication or redistributed directly or indirectly in any medium

 

28TH STORY of Level 1 printed in FULL format.

Copyright 1982 The New York Times Company
The New York Times

April 17, 1982, Saturday, Late City Final Edition

SECTION: Section 1; Page 2, Column 3; Foreign Desk

LENGTH: 782 words

HEADLINE: CHINA TERMS RELATIONS WITH U.S. AT CRITICAL STAGE

BYLINE: By CHRISTOPHER S. WREN, Special to the New York Times

DATELINE: PEKING, April 16

BODY:
   The Chinese Government warned today that Chinese-American relations remained at a critical stage over the Taiwan arms issue and that it was possible that they could worsen.

   The assertion, made today in a front-page commentary in the official People's Daily, seemed designed at least in part to assure Chinese readers that their Government had not given in to the Reagan Administration by failing to retaliate against its decision to sell military spare parts to Taiwan.

   ''Now, the relations between China and the United States are still at a critical juncture and the crisis of a likely retrogression of the relations exists, because the question of the United States selling of arms to Taiwan remains unsettled,'' said the commentary, which was circulated in full by the New China News Agency to give further exposure.

   The Reagan Administration notified China on Tuesday that it was presenting a $60 million package of aircraft spare parts and other supplies for Taiwan to Congress.

Strong Protest Lodged

   On Wednesday, the Chinese Foreign Ministry called in the United States Ambassador, Arthur W. Hummel Jr., to lodge what it called a strong protest. But China did not take steps to downgrade relations with the United States, as officials had earlier hinted it might.

   Instead, Peking tacitly accepted Washington's assurances that Taiwan had ordered the package before talks on the controversy began, that no weapons were involved and that further military transfers would not take place while China and the United States continued to discuss the matter.

   People's Daily, in reiterating these points today, referred to them as having a ''binding force.'' Consequently, Chinese readers were assured, China ''has

                    to




The New York Times, April 17, 1982

The clear implication presented by People's Daily was that the Reagan Administration had committed itself to provide no further arms to Taiwan as long as China insisted upon discussing the issue.

Concern Among Peking Leaders

The appearance of the commentary in the official Communist Party newspaper seemed to indicate a concern by the Chinese leadership that its failure to retaliate against the United States for arranging to send military spare parts to Taiwan was being misread at home, as well as abroad, as either acquiescence or loss of nerve.

It was possible that the regime of Deng Xiaoping had confronted criticism from hard-liners within the party and Government and was seeking to rebut inferences that it was soft on the Reagan Administration as well as to assure average Chinese that it had not backed down on the issue of Taiwan.

The People's Daily article was attributed to an anonymous commentator, which is usually an indication of authority. While it followed the outline of the protest presented to Ambassador Hummel on Wednesday, the tone was tougher.

The commentary accused the United States of ''playing some tricks openly or covertly'' by trying to sell arms to Taiwan, which Peking regards as its unrecovered province and not a legitimate sovereign nation. China has maintained that military sales to Taiwan infringe upon Peking's sovereignty.

'Principle of Mutual Respect'

''The relations between China and the United States must be based on the principle of mutual respect for sovereignty and territorial integrity and noninterference in each other's internal affairs,'' People's Daily said. ''If this fundamental principle is violated, it would be impossible to maintain the status quo of Chinese-United States relations, to say nothing of developing these relations.''

Today, Deng Xiaoping discussed both Chinese-American and Chinese-Rumanian relations with President Nicolae Ceaucescu, who has been in China on an official visit. At a news conference this afternoon, Mr. Ceaucescu refused to give details of their talk.

But Mr. Ceausescu, whose country China treats as a Communist ally, told journalists that ''the Chinese comrades are right when they say they insist on the respect of agreements that have been received and on the necessity for the United States to renounce once and forever its support for Taiwan.''

Mr. Ceausescu also said that Rumania wanted to see China and the Soviet Union resolve their differences but refused to say whether he was playing any mediating role.

LANGUAGE: ENGLISH





| CONTENTS | ON THE EDITORIAL PAGE | READER RESPONSES | TASTE | BOOKSTORE |

**CONTENTS**
**ON THE EDITORIAL PAGE**
◆ Today's Featured Article
◆ Hot Topic
◆ Also on WSJ.com
◆ International Opinion
**BEST OF THE WEB TODAY**
**E-MAIL SUBSCRIPTIONS**
◆ Political Diary
◆ Free Updates
**JOHN FUND ON THE TRAIL**
**PEGGY NOONAN**
**OPINIONJOURNAL FEDERATION**
◆ Featured Article
◆ Poll Watch
**THE JOURNAL EDITORIAL REPORT**
**ELECTORAL COLLEGE CALCULATOR**
**POETRY FOR THE WAR**
**READER RESPONSES**
**OUR FAVORITE SITES**
**ARCHIVES**
**TASTE**
**LEISURE & ARTS**
**FIVE BEST**
**COLUMNISTS**
◆ Pete du Pont
◆ Daniel Henninger
◆ Bret Stephens
◆ Kim Strassel
**RSS FEED**
**ABOUT US**
◆ Our Philosophy
◆ Who We Are
◆ Terms & Conditions
◆ Privacy Policy
◆ Contact Us
◆ How to Subscribe
◆ How to Advertise
◆ Op-Ed Guidelines

c⊂🔍 **Search**

[          ] GO

Wall Street Journal
Online Subscribers
GO DIRECTLY TO
[Select a Page ▾]

**WSJ.com Network**

Wall Street Journal
CareerJournal
CollegeJournal
RealEstateJournal
StartupJournal
WSJbooks
CareerJournalAsia

View latest America The Beautiful

**THE REAL WORLD**

## Let Zhang Shengli Stay

Are lunatics running the asylum policy?

**BY CLAUDIA ROSETT**
*Wednesday, July 31, 2002 12:01 a.m. EDT*

NEW YORK--Zhang Shengli is running out of options. He came by our office here this week, hoping a talk with the press might help save him from being deported to China--where he fears he would go straight to prison. I think his fears are well-founded, all the more so because he is not flashy, not brilliant, not famous. Mr. Zhang is a sturdy 48-year-old fellow with thick eyebrows, a warm smile and what he describes as "so-so" skills in house painting and carpentry. In many ways, his greatest obstacle to freedom is that he seems so ordinary.

But 20 years ago he did something that was not at all ordinary. On April 17, 1982, he took a running leap at the heavily guarded U.S. Embassy in Beijing and hurled himself over the wall. Once inside, he asked for asylum. He knew it was a risky bid. "You survive, you gain freedom; you fail, you go to jail," is how he explained it to me.

He failed. After fruitless attempts to enlist help from the British and Greek embassies in whisking away Mr. Zhang undetected, the U.S. Embassy staff expelled him later that same day through a main gate. One of the officials then at the embassy, Charles Martin, witnessed what happened next. Chinese security officers, who had ringed the compound after they saw Mr. Zhang go over the wall, hustled him into a car and drove off.

But Mr. Zhang didn't give up. In 1997 he made his way to the U.S. itself and asked again for asylum. His mistake, one expert tells me, may have been that instead of simply lying low and disappearing illegally into the Chinese community, he trusted the system and applied to the immigration courts for asylum. He has had no luck. This month, the Board of Immigration Appeals upheld the November 2000 ruling of a Boston immigration judge, Patricia Shepard, that Mr. Zhang is to be "removed and deported back to the People's Republic of China." Time is fast running out.

His mouth tight with worry, Mr. Zhang describes the welcome that awaits him back in China: "They will be waiting for me at the airport. They will handcuff me. They will not even give me a chance to go home. I will go directly to jail."

Given China's record of manhandling dissent, he's probably right, though our immigration authorities prefer to maintain otherwise. Mr. Zhang, with his bulldog desire

*July 3, 2007*
*1:25pm EDT*

RESPOND TO THIS ARTICLE
READ RESPONSES
E-MAIL THIS TO A FRIEND
PRINT FRIENDLY FORMAT
AUTHOR BIOGRAPHY
AUTHOR ARCHIVE

**Server not found**

**VIEWPOINT**

**The American Spectator**
The voice of the true conservative -- Ben Stein, the Washington Prowler and R. Emmett Tyrrell, Jr.

**Keep Our Markets Free**
Investing commentary from a conservative perspective.

**Newt Gingrich - Free**
Sign up for free email delivery of Newt's weekly newsletter - Winning the Future

**Mutual Fund Lemon List**
1,400+ Funds to banish from your portfolio now!

**Ann Coulter Weekly Column**
Ann's scathing commentary sent straight to your inbox every week Free!

**SuccessFactors**
Employee Performance Management solutions for companies of all sizes.

**Security Cameras**

**Car Donation**

**Home Security**
Protect your home and your privacy, with the company that lets you be in control.

**Wall Street Careers**

**$100k+ job search**

CareerJournalEurope
MarketWatch







Advertisement

for liberty, his criticism of China as a "communist tyranny" and his persistent history of seeking asylum in the U.S., has by now made himself quite visible to the Chinese authorities. But Mr. Zhang has not achieved prominence enough among Americans to secure his own safety. Instead, he occupies a precarious niche, exposed in his quest for liberty but not protected by it. His story cuts to the core of one of the big dilemmas of the free world. When citizens of unfree nations ask for asylum, it may not be possible to help them all.

But surely there comes a stage at which an individual has shown enough will and taken enough risk so that it is simply wrong--and damaging to our own principles of freedom and human dignity--to turn him away. Where is that line? And to what standards should asylum-seekers be held? In the post-Sept. 11 climate, as America continues to discover how horrifically some holders of Saudi and other Middle Eastern passports have abused our trust, it's tougher to argue for keeping a welcome mat out.

But Mr. Zhang's case has nothing to do with terrorism. All he threw over our embassy wall was himself. And when we refused his request, he left peacefully. Since he reached America, his problems have been in part that his story of past persecution in China has been hellishly tough to prove. With highly limited resources and no certainty about his future, he has been hard put just to scrape by, with the help of the Chinese dissident community. His English is still poor (he spoke with me through an interpreter). And when he began applying to the courts, he was unable to locate a witness who could even say whether he was indeed the man who once came over the U.S. Embassy wall.

Add to that the tall order of certifying details of the rest of his existence back in China. Compound it all with the labyrinthine requirements of U.S. immigration policy, which can get confusing even for the English-speakers who actually administer it at the Department of Justice. As one spokesman told me the other day, while trying to explain some of the official statistics, "There is absolutely nothing in the immigration system that's simple."

On top of that is an immigration policy that in some ways encourages our immigration officials to view the simple desire to live in America as a sort of irritating and suspect trait in foreigners. What you get is Mr. Zhang, in his white T-shirt and sneakers, with a desperate look in his eyes, unpacking on a table at our office big bundles of documentation he has amassed with great effort and care, none of it sufficient to satisfy the system.

———————————

According to Mr. Zhang's sworn statement, given in 1998 when he first filed his case with a U.S. immigration court, here's what happened after he was rejected at the embassy in 1982: He was sentenced in China to two years at a labor camp near his native city of Tianjin. The following year he escaped, made his way again toward the U.S. Embassy in Beijing, and was again nabbed by Chinese security forces. This time he was sentenced to three years in a prison camp in western China.

Released in 1986, he returned to Tianjin, but as a former prisoner he no longer had residency status. He lived with his parents. He married in 1988 and soon his wife bore a son. Mr. Zhang supported his family by peddling clothes on the street, harassed periodically by authorities.

In 1996 he saw an ad in the paper offering American business visas for $1,000. This inspired him to make another bid for freedom, He scraped together the money and traveled to San Francisco, where he tried to defect. But he wasn't sure how to go about it. He went to an FBI office, where officers sent him to the Immigration and Naturalization Service, where officials gave him forms to fill out and sent him away. He ran out of time and money. With the Chinese government probably none the wiser, he went back to China.

And he tried again. In 1997 he pulled together the fee for another visa, came again to the U.S., and this time applied through the courts for asylum, hoping eventually to bring over his wife and son. He got help from the Chinese dissident community, notably a New York-based group called Freedom and Democracy in China, whose chairman, Ni Yuxian, testified in 1998 that Mr. Zhang had already, by then, "been actively involved in the democracy movement for mainland China."

In September 2000, Mr. Zhang joined a much-publicized protest at New York's Lincoln Center, wearing a sign that said "Eliminate the one party dictatorship in China"--and his picture appeared in the Chinese-language World Journal. This past March he attended a meeting of the Overseas Chinese Democratic Movement and appeared in a group photo, along with such famous dissidents as Wei Jingsheng, on the cover of another U.S.-based Chinese-language publication, Beijing Spring.

———————————

Whatever impression all this might have made on Chinese state security agents, it has meant--officially--nothing to U.S. authorities. The immigration court's Ms. Shepard brushed aside his dissident activity, sniffing: "I give these almost no weight whatsoever." She further noted that Mr.

Zhang couldn't even come up with a witness to prove his story of persecution in China.

Undaunted, Mr. Zhang found fresh legal help. And this year, at last, he was able to locate the former U.S. diplomat, Mr. Martin, who in 1982 spoke with him during his brief interlude at the embassy and then saw him detained in the street. Mr. Martin, now working in the private sector, confirmed in a May 31 affidavit that Mr. Zhang was indeed the man who 20 years ago jumped the wall. Mr. Martin attested that Mr. Zhang has "been persecuted in the past on account of his allegiance to American ideals, and his protest activities since arriving in the United States would put him in even greater risk of persecution should he be forced to return to China."

No dice, said the board, which on July 15 rejected Mr. Zhang's application and ordered him booted. His lawyer, Kevin Reilly, plans to try another avenue of appeal, later this week. But barring interventions by Congress or the attorney general, he has little hope. America simply isn't that generous these days. This past year, U.S. immigration courts ruled on the cases of 46,824 applicants, and granted asylum to some 40%, including 2,624 Chinese--roughly one for every half million souls living under Beijing's tyranny.

Listening to Mr. Zhang, as he pleads the case that he is "looking for safe haven" but deeply scared by now of ending up in "a Chinese communist jail," it seems to me that surely America could find a little more room for those who risk so much to come over the wall.

*Ms. Rosett is a member of The Wall Street Journal's editorial board. Her column appears Wednesdays here and in The Wall Street Journal Europe.*

—————————

RESPOND TO THIS ARTICLE    READ RESPONSES    E-MAIL THIS TO A FRIEND    PRINT FRIENDLY FORMAT

HOME    TOP OF PAGE    AUTHOR BIO    ARCHIVE

SUBSCRIBE TO THE WALL STREET JOURNAL ONLINE OR TAKE A TOUR

SIGN UP TODAY FOR FREE MARKETWATCH MEMBERSHIP

Copyright © Dow Jones & Company, Inc. All Rights Reserved.
By using this site, you agree to the Terms of Use and Privacy Policy.

RSS  XML

ADVERTISERS LINKS  |  WHAT'S THIS?

**AARP & The Hartford Auto Insurance**
Over 50? Save up to $303 on auto insurance from AARP & The Hartford.
aarp.thehartford.com

**Alternative to Open Back & Neck Surgery**
Arthroscopic procedures, highly successful, get your life back!
www.laserspineinstitute.com

**Rates Near Historic Lows- Refi at 4.9%**
Refinance $300k loan for only $996/ month. Act now with Low.com!
www.low.com

# 中國事務

### 总编辑：伍凡

# 自由 民主 人权

## CHINAAFFAIRS.ORG

《中国事务》论坛 热点文章 文章分类 图片库 网络录音 公告栏 专栏作家 伍凡文集 《新唐人》独立评论 China Affairs

## 中国事务论坛

### 华尔街日报大发雷霆：哪个神经病在管庇护政策？

发言人: 智叟, on 8/1/2002 11:53:00 AM　　显示／隐藏文字

---

华尔街日报大发雷霆：哪个神经病在管庇护政策？

2002年8月1日 星期四

二十年前，1982年4月17日，天津的一个28岁的青年，通过收听敌台和在图书馆钻研《国际法》，知道了西方民主国家都有义务接受政治避难者，于是，他来到北京，跳进英国大使馆，被拒绝了；他又跳进希腊大使馆，被扔了出来。土尔其大使馆一样不收留他。最后，他翻墙跳进了美国驻北京大使馆。中国警察随即把美国大使馆包围了起来。形势十分紧张。中国要人，外电纷纷报道。

这个青年的名字叫张胜利。他于当天被美国大使馆"礼送"出来，当即遭到中共警察的逮捕。他的运气很糟。虽然当时的美国总统里根坚决不喜欢共产党，但当时的美国驻华大使是恒安石，一个内心钦佩共产党的左倾幼稚官僚。负责陪同张胜利离开大使馆的美国外交官查理.马丁最后紧紧地拥抱着张胜利，流着泪连声说"对不起"，眼看着张胜利被戴上手铐押走了。

多年之后，张胜利来到了美国，先是投奔FBI，要求叛变，人家嫌他不够资格，建议他申请政治避难。没想到，这才是他美国磨难的开始。政治避难被拒绝，上庭，再拒绝；上诉，再驳回。再上诉，再驳回。上个星期，张胜利的寻求美国自由的道路终于走到了头，随时面临遣返。显然，一回国，他必然再被捕坐牢。

华尔街日报看不过去了，昨天发表长篇编辑部文章，质问"哪个王八蛋管政治避难"，大标题是：让张胜利留下来！

美国移民局和在美国的大陆留学生等对寻求避难的中国人都有偏见。中国所有被遣送回去的，没有不被劳教和罚款的。其他国家包括古巴都没有。

这本身就是足够的理由取得避难。但看看移民局批准避难的比例，中国人大概5%左右的被批准，而从恐怖国家来的(伊拉克、阿富汗)申请避难，70%到90%被批准。这么大的差距，华人社区没人发出任何声音！

如果有人为他们说话，怎么会有遣返？建议这位老兄马上去加拿大，直接去边境，说要避难。加拿大政策要宽松多。关键是美国的移民政策歧视华人！(起码在这点上)。至于说"在美国的大陆留学生对寻求避难的中国人有偏见"，让我举例说明吧：去年，中国一个女记者在纽约申请政治避难被拒绝，她把卷宗转移到华盛顿DC，要我帮忙，她说，华府某著名大学法学院的人权辩护项目在帮助她准备出庭材料，可是，该校一个中国留学生却故意把她在香港《九十年代》发表的批评中国政府的文章翻译的完全扭曲。她说：那个法学院的留学生一定是故意要害她。我一看，果然翻译得很离谱，恶意的，若把他的译文递交上去，必定被拒绝。

最近炒得很热的北朝鲜难民冲击北京使馆区的故事，让我联想到二十年前天津青年张胜利和三十年前广州街头的乞丐儿童黎智英。张胜利的避难要求被拒绝后，他命运就充满了监狱、劳改营，逃亡，磨难，最后一事无成；黎智英游泳到了香港，一个不认字的地皮无赖硬是闯出一片天地。

中国政府一千个不是，一万个混蛋，他们没有遣返朝鲜难民，而是把他们放生到自由世界，我们可以企望，不出十年，这些难民中必定有英雄出世。你我沾他们光也未可知呢。

中国人，太需要一些逃生的渠道了。可惜，现在世界上，谁也不敢接收中国难民。香港回归了，台湾吓破了胆，东南亚国家普遍害怕共产党。欧美被资本家的贪欲给劫持了。谁也不得罪中国政府。我们中国人将逃无处逃，死无葬身之地啊。(智叟)

THE REAL WORLD
Let Zhang Shengli Stay
Are lunatics running the asylum policy?
BY CLAUDIA ROSETT, WALL STREET JOURNAL

NEW YORK--Zhang Shengli is running out of options. He came by our office here this week, hoping a talk with the press might help save him from being deported to China--where he fears he would go straight to prison. I think his fears are well-founded, all the more so because he is not flashy, not brilliant, not famous. Mr. Zhang is a sturdy 48-year-old fellow with thick eyebrows, a warm smile and what he describes as "so-so" skills in house painting and carpentry. In many ways, his greatest obstacle to freedom is that he seems so ordinary. But 20 years ago he did something that was not at all ordinary. On April 17, 1982, he took a running leap at the heavily guarded U.S. Embassy in Beijing and hurled himself over the wall. Once inside, he asked for asylum. He knew it was a risky bid. "You survive, you gain freedom; you fail, you go to jail," is how he explained it to me.

He failed. After fruitless attempts to enlist help from the British and Greek embassies in whisking away Mr. Zhang undetected, the U.S.

Embassy staff expelled him later that same day through a main gate. One of the officials then at the embassy, Charles Martin, witnessed what happened next. Chinese security officers, who had ringed the compound after they saw Mr. Zhang go over the wall, hustled him into a car and drove off.

But Mr. Zhang didn't give up. In 1997 he made his way to the U.S. itself and asked again for asylum. His mistake, one expert tells me, may have been that instead of simply lying low and disappearing illegally into the Chinese community, he trusted the system and applied to the immigration courts for asylum. He has had no luck. This month, the Board of Immigration Appeals upheld the November 2000 ruling of a Boston immigration judge, Patricia Shepard, that Mr. Zhang is to be "removed and deported back to the People's Republic of China." Time is fast running out.

His mouth tight with worry, Mr. Zhang describes the welcome that awaits him back in China: "They will be waiting for me at the airport. They will handcuff me. They will not even give me a chance to go home. I will go directly to jail."Given China's record of manhandling dissent, he's probably right, though our immigration authorities prefer to maintain otherwise. Mr. Zhang, with his bulldog desire for liberty, his criticism of China as a "communist tyranny" and his persistent history of seeking asylum in the U.S., has by now made himself quite visible to the Chinese authorities. But Mr. Zhang has not achieved prominence enough among Americans to secure his own safety. Instead, he occupies a precarious niche, exposed in his quest for liberty but not protected by it. His story cuts to the core of one of the big dilemmas of the free world. When citizens of unfree nations ask for asylum, it may not be possible to help them all.

But surely there comes a stage at which an individual has shown enough will and taken enough risk so that it is simply wrong--and damaging to our own principles of freedom and human dignity--to turn him away. Where is that line? And to what standards should asylum-seekers be held? In the post-Sept. 11 climate, as America continues to discover how horrifically some holders of Saudi and other Middle Eastern passports have abused our trust, it's tougher to argue for keeping a welcome mat out.

But Mr. Zhang's case has nothing to do with terrorism. All he threw over our embassy wall was himself. And when we refused his request, he left peacefully. Since he reached America, his problems have been in part that his story of past persecution in China has been hellishly tough to prove. With highly limited resources and no certainty about his future, he has been hard put just to scrape by, with the help of the Chinese dissident community. His English is still poor (he spoke with me through an interpreter). And when he

began applying to the courts, he was unable to locate a witness who could even say whether he was indeed the man who once came over the U.S. Embassy wall.

Add to that the tall order of certifying details of the rest of his existence back in China. Compound it all with the labyrinthine requirements of U.S. immigration policy, which can get confusing even for the English-speakers who actually administer it at the Department of Justice. As one spokesman told me the other day, while trying to explain some of the official statistics, "There is absolutely nothing in the immigration system that's simple."

On top of that is an immigration policy that in some ways encourages our immigration officials to view the simple desire to live in America as a sort of irritating and suspect trait in foreigners. What you get is Mr. Zhang, in his white T-shirt and sneakers, with a desperate look in his eyes, unpacking on a table at our office big bundles of documentation he has amassed with great effort and care, none of it sufficient to satisfy the system.

According to Mr. Zhang's sworn statement, given in 1998 when he first filed his case with a U.S. immigration court, here's what happened after he was rejected at the embassy in 1982: He was sentenced in China to two years at a labor camp near his native city of Tianjin. The following year he escaped, made his way again toward the U.S. Embassy in Beijing, and was again nabbed by Chinese security forces. This time he was sentenced to three years in a prison camp in western China. Released in 1986, he returned to Tianjin, but as a former prisoner he no longer had residency status. He lived with his parents. He married in 1988 and soon his wife bore a son. Mr. Zhang supported his family by peddling clothes on the street, harassed periodically by authorities.

In 1996 he saw an ad in the paper offering American business visas for $1,000. This inspired him to make another bid for freedom, He scraped together the money and traveled to San Francisco, where he tried to defect. But he wasn't sure how to go about it. He went to an FBI office, where officers sent him to the Immigration and Naturalization Service, where officials gave him forms to fill out and sent him away. He ran out of time and money. With the Chinese government probably none the wiser, he went back to China.

And he tried again. In 1997 he pulled together the fee for another visa, came again to the U.S., and this time applied through the courts for asylum, hoping eventually to bring over his wife and son. He got help from the Chinese dissident community, notably a New York-based group called Freedom and Democracy in China, whose chairman, Ni Yuxian, testified in 1998 that Mr. Zhang had already, by then, "been actively involved in the democracy movement for

mainland China."

In September 2000, Mr. Zhang joined a much-publicized protest at
New York's Lincoln Center, wearing a sign that said "Eliminate the
one party dictatorship in China"--and his picture appeared in the
Chinese-language World Journal. This past March he attended a
meeting of the Overseas Chinese Democratic Movement and appeared in
a group photo, along with such famous dissidents as Wei Jingsheng,
on the cover of another U.S.-based Chinese-language publication,
Beijing Spring.

Whatever impression all this might have made on Chinese state
security agents, it has meant--officially--nothing to U.S.
authorities. The immigration court's Ms. Shepard brushed aside his
dissident activity, sniffing: "I give these almost no weight
whatsoever." She further noted that Mr. Zhang couldn't even come up
with a witness to prove his story of persecution in
China.Undaunted, Mr. Zhang found fresh legal help. And this year,
at last, he was able to locate the former U.S. diplomat, Mr.
Martin, who in 1982 spoke with him during his brief interlude at
the embassy and then saw him detained in the street. Mr. Martin,
now working in the private sector, confirmed in a May 31 affidavit
that Mr. Zhang was indeed the man who 20 years ago jumped the wall.
Mr. Martin attested that Mr. Zhang has "been persecuted in the past
on account of his allegiance to American ideals, and his protest
activities since arriving in the United States would put him in
even greater risk of persecution should he be forced to return to
China."

No dice, said the board, which on July 15 rejected Mr. Zhang's
application and ordered him booted. His lawyer, Kevin Reilly, plans
to try another avenue of appeal, later this week. But barring
interventions by Congress or the attorney general, he has little
hope. America simply isn't that generous these days. This past
year, U.S. immigration courts ruled on the cases of 46,824
applicants, and granted asylum to some 40%, including 2,624 Chinese-
-roughly one for every half million souls living under Beijing's
tyranny.

Listening to Mr. Zhang, as he pleads the case that he is "looking
for safe haven" but deeply scared by now of ending up in "a Chinese
communist jail," it seems to me that surely America could find a
little more room for those who risk so much to come over the wall.

Ms. Rosett is a member of The Wall Street Journal's editorial
board. Her column appears Wednesdays here and in The Wall Street
Journal Europe.

送交者: 智叟

中国事务http://www.chinaaffairs.org转载

---

C
07-1209
RWR

JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| SHENGLI ZHANG<br>1843 Capitol Ave., N.E.<br>Washington, D.C. 20002 | MICHAEL CHERTOFF, in his official<br>capacity as Secretary of the<br>Department of Homeland Security, et al. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    11001
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Scott A. Conwell, Esq.
CONWELL, LLC
2138 Priest Bridge Court, Suite No. 4
Crofton, MD 21114

Case: 1:07-cv-01209
Assigned To : Roberts, Richard W.
Assign. Date : 7/5/2007
Description: Admn. Agency review

## II. BASIS OF JURISDICTION
(PLACE an x IN ONE BOX ONLY)

- ● 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ⊗ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ⊗ C. *Administrative Agency Review* | ○ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☒ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. *General Civil (Other)* | OR | ○ F. *Pro Se General Civil* |
|---|---|---|

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| O **G.** *Habeas Corpus/ 2255* | O **H.** *Employment Discrimination* | O **I.** *FOIA/PRIVACY ACT* | O **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| O **K.** *Labor/ERISA (non-employment)* | O **L.** *Other Civil Rights (non-employment)* | O **M.** *Contract* | O **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
⊗ 1 Original Proceeding  O 2 Removed from State Court  O 3 Remanded from Appellate Court  O 4 Reinstated or Reopened  O 5 Transferred from another district (specify)  O 6 Multi district Litigation  O 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
5 U.S.C. §§ 702 and 706, Mandamus to compel agency action unlawfully withheld    5 USC 551 Admn. Proc. Act

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  DEMAND $ [_____]  Check YES only if demanded in complaint  JURY DEMAND: YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE 7/3/07  SIGNATURE OF ATTORNEY OF RECORD [signature]

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.