UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
---------------------------------------------------------x
SHENGLI ZHANG                             :
                                          :
              Plaintiff,                  :    CIVIL ACTION NO.: RWR-07-1209
                                          :
              v.                          :
                                          :
MICHAEL CHERTOFF, et al.                  :
                                          :
              Defendants.                 :
---------------------------------------------------------x
```

## **MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Shengli Zhang hereby moves for Summary Judgment for mandamus relief ordering the Defendants to timely adjudicate his Application for Asylum and for Withholding of Removal.  (See Exhibit filed at Paper 11-2).  Plaintiffs have attached a Memorandum in Support at Exhibit (1) and a Proposed Order.  More than twenty days have passed since the commencement of the action.  This matter has not yet been scheduled for trial.  There are no genuine issues of material fact and the Plaintiff is entitled to judgment as a matter of law.

Respectfully submitted,

CONWELL, LLC

__/s/_____
Scott A. Conwell (Bar No. 468989)
    scott@conwellusa.com
2138 Priest Bridge Court, Suite No. 4
Crofton, Maryland 21114
TELE: (410) 451-2707
FAX: (410) 451-2706

*Attorney for Plaintiff*

Dated: January 24, 2008

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this _24th _ day of _ January _, 2008, a true and correct copy of the foregoing Motion for Summary Judgment was served via ECF on the following counsel of record:

Jeffrey A. Taylor
Rudolph Contreras
Heather Graham-Oliver
U.S. Attorney's Office
Judiciary Center Building
555 Fourth Street, NW
Suite 4-4808
Washington, DC 20530


_____/s/_____
Scott A. Conwell

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------------------------------x

SHENGLI ZHANG                                  :
                                               :
            Plaintiff,                         :        CIVIL ACTION NO.: RWR-07-1209
                                               :
            v.                                 :
                                               :
MICHAEL CHERTOFF, *et al*.                     :
                                               :
            Defendants.                        :
---------------------------------------------------------x

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The Plaintiff, Shengli Zhang, hereby moves for Summary Judgment for mandamus relief ordering the Defendants to timely adjudicate his Application for Asylum and for Withholding of Removal.  (See Exhibit filed at Paper 11-2). The Defendants, in their official capacity as heads of the U.S. government agencies, in particular the U.S. Citizenship & Immigration Services ("USCIS")[1] and the U.S. Department of Justice, have moved to dismiss (Paper No. 12) Plaintiff's First Amended Complaint (Paper No. 11) for want of jurisdiction in this Court.  As detailed in Plaintiff's Opposition to that Motion (Paper No. 13), incorporated herein by reference, the Defendants have inaccurately stated Plaintiffs' claim for relief and failed to cite the ***recent precedent of this Court on this precise issue***, Liu v. Novak, Civil Action No. EGS-07-263, p. 17-18 (D. D.C. August 30, 2007).  In Liu, this Court, in deciding these same issues, simultaneously granted Summary Judgment to Plaintiff and denied Defendants' Motion to

---

1 The terms Immigration and Naturalization Service ("INS"), Department of Homeland Security ("DHS") and U.S. Citizenship & Immigration Services ("USCIS") as used herein all refer to the same administrative agency responsible for deciding asylum matters.

1

Dismiss.

In support of Plaintiff's Motion, we submit the uncontroverted facts as set forth in the accompanying Statement in Support of Plaintiff's Motion for Summary Judgment at Exhibit (2). For the following reasons, Plaintiff's Motion should be granted.

The material facts in this matter are not in dispute. The Defendants are clearly required to take specific steps to process Plaintiff's Application within a fixed statutory time period and then to timely adjudicate that Application. The undisputed facts are that Defendants have taken no action whatsoever, and thus are subject to this Court's mandamus power to compel the required non-discretionary actions and to adjudicate Plaintiff's claim. Plaintiff does not seek in this Motion to dictate the outcome of Defendants' discretionary action, only to compel the agency to provide him the adjudicative hearing to which he is entitled by law. As this Court held in Liu, this Court has jurisdiction to resolve issues of mandamus over the adjudicating agency.

Plaintiff's Application in this case arises as the result of a miscarriage of justice as factually determined by the U.S. Justice Department at oral arguments in Zhang v. INS, 348 F.3d 289 (1st Cir. 2003) [2] when the Justice Department attorney admitted that had Mr. Zhang timely appealed his case based on the new corroborative evidence in his Motion to Reopen and reconsider, the new evidence would have compelled a finding in Plaintiff Zhang's favor. This

---

2 The Plaintiff's Motion to Reopen and Reconsider was denied on complex procedural grounds as described by the U.S. Court of Appeals for the First Circuit:

> Zhang appeals the credibility determinations of the IJ and BIA, and their applications of the "well founded fear" of future persecution standard. Unfortunately for Zhang, his petition to this court on August 13, 2002, for review of these initial determinations came well after the thirty-day time limit imposed by the Illegal Immigration Reform and Immigration Responsibility Act of 1996, Pub.L. No. 104-208, 110 Stat. 3009-3546 (codified in scattered sections of Title 8 and 18) (IIRIRA). Under the IIRIRA, all final BIA orders must be appealed to this court within thirty days. 8 U.S.C. § 1252(b)(1). This need to timely appeal is a strict jurisdictional requirement. . . . In this case, because Zhang appealed the BIA's March 28, 2002, denial of asylum well over the thirty-day limit, we lack jurisdiction to review the underlying denial.

Zhang v. INS, 348 F.3d 289 (1st Cir. 2003).

2

injustice was acknowledged by the First Circuit when it factually determined that Mr. Zhang had been imprisoned by the Chinese government for a period of four (4) years in "hard labor for 'counter-communist behaviors.'"  <u>Zhang</u>, 348 F.3d at 291.

Plaintiff Zhang was prosecuted by the Chinese government for the political crime of declaring his support for democracy, imprisoned for years, tortured and suffered continued persecution.  Plaintiff came to the U.S. and filed for asylum in 1998. The Immigration Judge ("IJ") erroneously denied his request for asylum finding his story "fantastic," and erroneously found a requirement for the Plaintiff to locate a specific corroborating witness from the U.S. State Department.  He was not able to do so by the time his administrative appeal rights had expired.  By the time he was able to fortunately find this specific corroborating witness, the INS and then the Board of Immigration Appeals refused to reopen and reconsider his case.  This refusal was appealed to the U.S. Court of Appeals for the First Circuit.

In May 2004, Plaintiff submitted a new Application for Asylum based on this new evidence constituting changed circumstances affecting his eligibility for asylum. (See Application for Asylum filed at Paper No. 11-2).  The Defendants have failed to take any action at all to timely process and adjudicate Plaintiff's new Application for Asylum.  The USCIS Service Center was required to mail an Acknowledgement of Receipt notice within three business days and place it in the applicant's file within ten business days and forward the new file to the appropriate office within twenty-one days of receipt.  They were then required to schedule Plaintiff for a new interview and provide a new adjudication.  They breached all of these duties.

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment should be granted only if the movant has shown there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56, Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Waterhouse v. Dist. Of Columbia, 298 F.3d 989, 991 (D.C. Cir. 2002). The Court must view all facts in the light most favorable to the non-moving party, but the non-moving party's opposition must consist of more than mere unsupported allegations or denials, and must be supported by affidavits or other competent evidence with specific facts demonstrating there is a genuine issue for trial. Celotex, 477 U.S. at 324.

## ARGUMENT

This instant action is for mandamus to compel the USCIS to timely perform its statutory duty as a government agency regarding the Plaintiff's new Application for Asylum, which this government agency has failed to process or act upon in any reasonable manner. The sole legal and factual issue is whether the agency has failed to take a non-discretionary action affecting Plaintiff's rights.

This case of mandamus is simple. The Agency is under a clear statutory duty to take certain non-discretionary procedural steps and it is undisputed that it has not done so within a specific time period. It is indisputable that the Plaintiff has been injured by the Defendants' failure. And indeed, this is exactly what this Court unequivocally held in Liu v. Novak.

Due to Plaintiff's new evidence – a corroborating witness and a document – and the admission of the Defendant Department of Justice that Plaintiff Zhang should have been granted asylum based upon this new evidence, Plaintiff filed his new Application, upon which USCIS has refused to act. Defendants have failed to provide any grounds for denial, or for their

4

inaction, nor could they since the statutory command is clear and directory and brooks no exceptions. Instead, Defendants have left the Plaintiff in limbo, in clear violation of their statutory duty. The relief requested is simply that this Court exercise its power of mandamus, order this government agency to grant Plaintiff a hearing within thirty days, or such time as the parties may agree.

### Statutory Framework

The Administrative Procedures Act ("APA") provides for judicial review of an agency action, see 5 U.S.C. §701(a), except where a statute precludes judicial review or agency actions are committed to agency discretion by law. The Plaintiff is seeking judicial review under §701 and under §706 which address the scope of review. Section 706 authorizes a review in Court to decide relevant questions of law and determining the meaning or applicability of the terms of an agency action. The Court is authorized to compel agency action unlawfully withheld or unreasonably delayed. §706(1). Agency action is defined at 5 U.S.C. §55I(13) to include agency rule, order, license, sanction, relief or the equivalent or denial thereof, or ***failure to act.*** Id (emphasis added). Thus, the APA authorizes judicial review of agency's failure to act where that action is unlawfully withheld or unreasonably delayed. Only if the Court is deprived of jurisdiction under §701 because a statute precludes judicial review or agency action is committed to agency discretion by law would the Plaintiff be deprived of judicial review.

The APA provides the requirement that the action by the agency must be timely in stating:

> With due regard for the convenience and necessity of the parties or their representatives and ***within a reasonable time***, each agency shall proceed to conclude a matter presented to it.

5 U.S.C. §555(b)(emphasis added).

Clearly, the APA contemplates and requires that an agency complete its required actions within a reasonable time and that a failure to act is agency action that is reviewable under §701. As noted above, the APA specifically authorizes review by a court to compel agency action unlawfully withheld or unreasonably delayed.  5 U.S.C. §706(1). Further, the APA announces a right of review for any person suffering a legal wrong because of agency action. 5 U.S.C. §702.

The statutory framework requiring the agency to act is found in the Immigration and Naturalization Act, I.N.A. and implementing C.F.R. regulations.  These provide a mechanism for an alien refugee in this country to apply for asylum as a legal resident of the United States.  The I.N.A. § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A)(2002), provides in pertinent part:

> Sec. 1101. Definitions
>     a) As used in this chapter—
>     (42) The term "refugee'" means
>     (A) any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of . . . political opinion.

8 C.F.R. § 208.13(b)(1)(2003) (emphasis added).

The procedure for invoking such rights is to file a I-589 Application for Asylum and for Withholding of Removal with the applicable agency Service Center.   The Agency has implemented procedures for processing asylum applications that are published in its Affirmative Asylum Procedures Manual, Office of International Affairs, Asylum Division (February 2003) (hereinafter "Manual"), a manual still in effect.[3]  The applicable pages are at Exhibit (3).  Upon

---

3 Found at http://www.uscis.gov/files/nativedocuments/AffrmAsyManFNL.pdf on the USCIS webpage on "Immigration Handbooks, Manuals, and Policy Guidance" at http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=a2e29c7755cb9

receipt of the I-589 Application, the agency Service Center mails an Acknowledgement of Receipt notice with a receipt number within three (3) business days and places it in the applicant's file (A-file) within ten (10) business days. <u>See</u> Exhibit (3), Manual p. 8 at ¶ D.1. The Service Center forwards the new A-file to the appropriate asylum office within twenty-one (21) days of receipt. <u>See</u> Manual p. 9 at ¶ E.1. If the agency has found that the application is not complete, it informs the Applicant within thirty (30) days after its receipt of the application or it is deemed under law to be complete.[4] The Agency Asylum Office then schedules the applicant for an interview. <u>See</u> Manual p. 9 at ¶ G. The Agency Asylum Office notifies the applicant of the interview by mail. <u>See</u> Manual p. 11 at ¶ G.3. .

Finally, it should be noted that there are specific times within which the USCIS is required to initiate the processing of the Application by acknowledging receipt and opening the file, which it failed to comply. Moreover, the absence of a specific time frame for conducting the applicant interview, reviewing evidence and conducting the adjudicatory hearing, and that the ultimate action on the application is discretionary does not mean that Congress intended that the government could indefinitely delay adjudication of the application. There is no indication of such intent in the statute or implementing regulations. To the contrary, the statute is silent with

---

010VgnVCM10000045f3d6a1RCRD&vgnextchannel=a2e29c7755cb9010VgnVCM10000045f3d6a1RCRD.
4 The regulations state:

> An asylum application that does not include a response to each of the questions contained in the Form I–589, is unsigned, or is unaccompanied by the required materials specified in paragraph (a) of this section is incomplete. The filing of an incomplete application shall not commence the 150-day period after which the applicant may file an application for employment authorization in accordance with §208.7. **An application that is incomplete shall be returned by mail to the applicant within 30 days of the receipt of the application by the Service. If the Service has not mailed the incomplete application back to the applicant within 30 days, *it shall be deemed complete.*** An application returned to the applicant as incomplete shall be resubmitted by the applicant with the additional information if he or she wishes to have the application considered;

8 C.F.R. § 208.3 (emphasis added).

regard to the timeframe. The Administrative Procedures Act therefore provides the timeframe.

The timeframe is one of reasonableness. 5 U.S.C. §555(b) and §706(1).

### Mandamus is Appropriate Because Defendants Have Breached a Clear Non-Discretionary To Process The Application According to Strict Timelines, And To Adjudicate The Application Within a Reasonable Time.

There can be no dispute as to the material facts, which alone are sufficient to compel this

Court to enter Summary Judgment in favor of the Plaintiff.  After Plaintiff properly filed his

Application for Asylum, the USCIS failed to acknowledge receipt within three days, failed to

place it in the applicant's file (A-file) within ten (10) business days, failed to forward the new A-

file to the appropriate asylum office within twenty-one (21) days of receipt.  The Application

must be deemed to be complete as a matter of law because it was not returned to Plaintiff within

the requisite thirty (30) days to notify the Applicant to correct any incompletion. 8 C.F.R.

§ 208.3.

The USCIS has not taken any of the mandatory steps it is required to perform to

adjudicate Plaintiff's application – there is no scheduled any interview by any asylum officer, no

opportunity to respond, no evaluation of evidence, no adjudicatory hearing, and no decision.  All

of these non-discretionary actions are required by statute and mandatory Agency procedure.

Defendants have failed to perform any of them. 8 C.F.R. § 208.9.

The Plaintiff's right to Summary Judgment on the uncontroverted and indisputable facts

of this case is controlled by this Court's recent holding in Liu v. Novak, Civil Action No. EGS-

07-263, p. 17-18 (D. D.C. August 30, 2007).  There, as here, these Defendants denied a Chinese

national residing in the U.S. his mandatory adjudicatory hearing on his residency status, in that

case for adjustment to lawful permanent resident.  There, as here, these Defendants challenged

this Court's jurisdiction for mandamus to compel the mandatory adjudicatory hearing, but not the

outcome of that hearing, which is discretionary. This Court held on no uncertain terms that:

> The D.C. Circuit, however, allows review of agency inaction for certain types of claims. *See id.* One type are claims that allege that "the pace of the agency decisional process lags unreasonably." *Sierra Club v. Thomas,* 828 F.2d 783, 794 (D.C. Cir. 1987). In such cases, "the statutory duty involved . . .does not specify what course of action shall be taken. Rather, regardless of what course it chooses, the agency is under a duty not to delay unreasonably in making that choice." *Id.* Agencies most often bear this duty of timeliness as a result of the APA's broad prohibition against "unreasonable delay." *Id.* (citing Page 18 5 U.S.C. §§ 555(b), 706(1)).

Liu v. Novak, Civil Action No. EGS-07-263, p. 17-18 (D. D.C. August 30, 2007). Therefore, in

the instant case, as in Liu, "the Court does have jurisdiction over plaintiff's APA claim that

defendants have unreasonably delayed adjudicating his application." Id. at 18.

The Court in Liu not only denied Defendants' Motion to Dismiss for want of jurisdiction,

but went on to grant Liu's simultaneous Motion for Summary Judgment on the same material

facts as are here present. Indeed, in Liu, unlike in the instant case, there was no assertion of

Defendants' failure to perform certain acts (acknowledgment of receipt, setting up the file)

within a mandatory time period, making the instant case even stronger for summary judgment. In

Liu, the Court determined that in the absence of a statutory express time period for conducting a

mandatory adjudication, the APA imposes upon an agency "a duty to conclude a matter

presented to it within a 'reasonable time.' 5 U.S.C. sec. 555(b)." Liu, at 16.

The Court, relying on fully applicable decisions of the U.S. Court of Appeals for the D.C.

Circuit, made it crystal clear that this Court has the power to review "agency inaction" for claims

that "the pace of the agency decisional process lags unreasonably." Id. at 17, citing Sierra Club v.

Thomas, 828 F.2d 783, 794 (D.C. Cir. 1987). The Court determined that the delay in Liu of

more than three years from filing the application without any decision was unreasonable and

ordered that the agency complete the adjudication on his application within three months from

the date of the Opinion. <u>Liu</u> at 22.

Here, Mr. Zhang submitted his application in May, 2004, and it was deemed complete under law thirty days later in June 2004.  Zhang filed his suit more than three years later, and, after continued delays, is now approaching four years without any adjudication. Hence, under the reasoning of <u>Liu,</u> Zhang too is entitled to Summary Judgment on the grounds of unreasonable delay in adjudication. Moreover, unlike the <u>Liu</u> case, the Defendants in the instant case, by and through the United States Attorney prosecuting his initial appeal, admitted that Zhang now had the requisite corroborating evidence of persecution by the Chinese government and fully meets the requirements for asylum. On these facts, there can be no reason for **any** further delay in adjudication and approval of Zhang's Application, and, based on the schedules in the Agency's procedure Manual, any delay of more than a month, at most, is unreasonable.

Nonetheless, under the applicable six factor test to determine unreasonable delay applied in <u>Liu</u>, pursuant to <u>Telecommunications Research and Action Center v. FCC</u>, 750 F.2d 70 (D.C. Cir. 1984) ("<u>TRAC</u>"), the result in the instant case must be identical to <u>Liu</u>. Applying that <u>TRAC</u> test, the outcome is even more compelling.

 (1) The time to make the decision, approaching four (4) years, is unreasonable particularly where Defendants' own attorney has conceded that Mr. Zhang has met all the requirements for asylum which should have been granted the first time. Here unlike <u>Liu</u>, all the necessary checks and investigations have been performed.

(2)  Congress has not provided an express timetable for adjudication, but has provided a very rapid one for establishing the file and determining whether the Application is complete, granting mere days for those administrative tasks, and providing strong evidence that a delay of years after completion of those duties is on its face unreasonable. The failure to complete the

10

time-bound tasks should be grounds alone for entry of judgment against defendants.

(3)  The delay affects "human health and welfare," not merely economics, and the nature and extent of the interests prejudiced by the delay are substantial. As with Mr. Liu, the delay denies Mr. Zhang important rights gained by permanent resident status, including the right to "petition on behalf of close family members and adversely impacts his ability to seek United States citizenship." These factors "weigh in favor of finding the delay unreasonable." Liu at 20-21.

(4)  The result of expediting delayed action on other agency activities of a higher or competing priority should be negligible because of all the work that has already been performed on Plaintiff's case. There is no ongoing investigation with regard to his status. He has been found to qualify for asylum, is no danger to the United States, and approval of his Application should be a mere administrative task, and would clear the Defendants' dockets immediately and free up far more time for other priorities than engaging in this pointless, and ultimately futile litigation.

Hence, on these facts, and under the controlling precedent of the Liu case, the Plaintiff is entitled to an Order of Mandamus requiring prompt adjudication of his 2003 Application for Asylum.  There can be no dispute as to the material facts, which alone are sufficient to compel this

## The Agency Should Be Ordered to Utilize Its Procedure for Expeditious Processing

An asylum office director may determine that it is in the best interest of the INS to process an asylum application more expeditiously than usual because there is a special interest in the case.  See Exhibit (3), Manual p. 53.  In the instant case, given the egregious injustices, the clear law, and the indisputable material facts, it is clearly in the best interest of the United States

11

to ensure that justice is ultimately done and the laws of the United States followed.  The Defendants should be ordered to expeditiously process Mr. Zhang's application.

## CONCLUSION

The relief sought is that the government be compelled to adjudicate Plaintiff's Application for Asylum and then to exercise its discretion to grant or deny asylum. This non-discretionary duty is enforceable under the Mandamus Act as well as under the Administrative Procedures Act in conjunction with the Immigration and Naturalization Act. For the reasons set forth above, the Plaintiff requests that his Motion for Summary Judgment be granted and Defendants to expeditiously process the Plaintiff's application.

Respectfully submitted,

CONWELL, LLC


__/s/_____
Scott A. Conwell (Bar No. 468989)
   scott@conwellusa.com
2138 Priest Bridge Court, Suite No. 4
Crofton, Maryland 21114
TELE: (410) 451-2707
FAX: (410) 451-2706


*Attorney for Plaintiff*

Dated: January 24, 2008


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _24th_ day of _January_, 2008, a true and correct copy of the foregoing Motion for Summary Judgment was served via ECF on the following counsel of record:

> Jeffrey A. Taylor
> Rudolph Contreras
> Heather Graham-Oliver
> U.S. Attorney's Office
> Judiciary Center Building
> 555 Fourth Street, NW
> Suite 4-4808
> Washington, DC 20530


____/s/_____
Scott A. Conwell

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
-----------------------------------------------------------x
SHENGLI ZHANG                              :
                                           :
              Plaintiff,                    :      CIVIL ACTION NO.: RWR-07-1209
                                           :
       v.                                   :
                                           :
MICHAEL CHERTOFF, et al.                    :
                                           :
              Defendants.                   :
-----------------------------------------------------------x
```

## ORDER

Upon consideration of Plaintiff's Motion for Summary Judgment and Defendants' Opposition thereto, and for good cause shown, it is this ____ day of _____, 2008, by the United States District Court for the District of Maryland,

ORDERED, that the Plaintiffs' Motion for Summary Judgment is GRANTED, and it is further

ORDERED, that the Defendants expeditiously process Plaintiff's application for asylum and grant a hearing within thirty (30) days and adjudicate his application within forty-five (45) days; Defendants' Motion to Dismiss is hereby DENIED.

_____
Benson E. Legg
United States District Judge

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

--------------------------------------------------------x
SHENGLI ZHANG                          :
                                       :
            Plaintiff,                 :    CIVIL ACTION NO.: RWR-07-1209
                                       :
            v.                         :
                                       :
MICHAEL CHERTOFF, *et al*.             :
                                       :
            Defendants.                :
--------------------------------------------------------x

## STATEMENT IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1.      Plaintiff Shengli Zhang is a 52-year-old citizen of the Republic of China (his country of last residence) and a current resident of Washington, D.C.

2.      Mr. Zhang, who was born in Tiajin, China, near Beijing, on March 4, 1954, has demonstrated a lifetime commitment to freedom and democracy, which has resulted in his persecution, four years imprisonment in hard labor and torture by the government of the People's Republic of China, and continued fear of being returned to China for more imprisonment and torture.

3.      Mr. Zhang met all the requirements for an asylum applicant, submitting valid documentation that will serve to corroborate his allegations against the Chinese government and prove the extent and duration of his persecution.

4.      Mr. Zhang timely filed for asylum on February 2, 1998 with the Immigration and Naturalization Service's ("INS") Boston office.

5.      Immigration Judge ("IJ") Patricia Sheppard issued a decision on November 7,

2000 denying Mr. Zhang's application for asylum and withholding of removal and ordering him to be removed and deported to the People's Republic of China.

6.    In her decision, the IJ made numerous errors of law and fact and demonstrated prejudice through her erroneous and biased analysis and statements.  Among other issues, the IJ required that Mr. Zhang locate a specific corroborative witness who was employed at the U.S. Embassy in Beijing even though corroborative evidence is not required to establish an asylum claim.

7.    At that time, Mr. Zhang was unable to locate the specific witness.  Without this specific corroborative proof, despite the law, the IJ found that Mr. Zhang was not credible and refused to believe Mr. Zhang's because his story "seem[s] to be somewhat fantastic".  Mr. Zhang, through his then-attorney, did not timely appeal the original IJ's finding since, among other reasons, at the time of that hearing he had not found the evidence demanded and required of him by the IJ.

8.    Plaintiff then obtained counsel who found the "required" corroborative evidence. The new evidence included the affidavit of a U.S. Embassy Employee corroborating Mr. Zhang's testimony (Exhibit (1) to Amended Complaint at 000007-10) – and additional supporting documentary evidence.  The specific evidence corroborated Mr. Zhang's allegedly "fantastic story."

9.    Counsel then filed a Motion to Reopen and Reconsider, which was denied by the Board of Immigration Appeals in an unreported opinion.

10.    The administrative denial was appealed to the U.S. Court of Appeals for the First Circuit.  In an opinion issued on November 3, 2003, the First Circuit factually determined that

2

Mr. Zhang had been imprisoned by the Chinese government for a period of four (4) years in hard labor for "counter-communist behaviors." Zhang v. INS, 348 F.3d 289 (1st Cir. 2003). Nonetheless the appeal was denied on procedural grounds for want of jurisdiction review the decision of the IJ or any additional evidence.

11.    In oral argument, under questioning by the U.S. Court of Appeals judges, the Department of Justice attorney admitted that, had Mr. Zhang made a timely appeal of the original decision, based on the new corroborative evidence in his motion to Reopen and reconsider, the Court would have legally found in his favor.

12.    In accordance with the administrative procedure permitting a party to submit a new application for asylum and, notably, if there exists any changed circumstances affecting a person's eligibility for asylum, Mr. Zhang filed a new application containing all of the extensive corroborating evidence, including the specific evidence demanded by the IJ.

13.    On May 12, 2004, Mr. Zhang submitted a valid I-589 Application for Asylum and for Withholding of Removal with the U.S. Citizenship and Immigration Services ("USCIS") based on the new evidence. (Exhibit (1) to Amended Complaint).

14.    The Application was sent to the Service Center for the District of Columbia, which was the Texas Service Center at that time.  The Texas Service Center received Zhang's application.

15.    Contrary to the administrative procedure and regulation, the Agency Service Center did not mail an Acknowledgement of Receipt notice with a receipt number within three (3) business days or at any other time.

16.    The Service neither placed it in the applicant's file (A-file) within ten (10)

3

business days nor did it forward the new A-file to the appropriate asylum office within twenty-one (21) days of receipt.

17.     The Application was not returned to Mr. Shang as incomplete within 30 days and is deemed complete as a matter of law.

18.     The Agency did not schedule the applicant for a new interview, conduct any interview, provide a new adjudication, or make a decision.

19.     The Defendants have indefinitely delayed a determination on whether to grant or deny Mr. Zhang's application for asylum.


Respectfully submitted,

CONWELL, LLC


__/s/_____
Scott A. Conwell (Bar No. 468989)
   scott@conwellusa.com
2138 Priest Bridge Court, Suite No. 4
Crofton, Maryland 21114
TELE: (410) 451-2707
FAX: (410) 451-2706

*Attorney for Plaintiff*

Dated: January 24, 2008

# AFFIRMATIVE ASYLUM PROCEDURES MANUAL
# OFFICE OF INTERNATIONAL AFFAIRS
# ASYLUM DIVISION

## FEBRUARY 2003



# I.   BACKGROUND INFORMATION

## A.   MANUAL CONTENTS

This Manual provides information on how to process an affirmative asylum application within an asylum office. Unless specifically indicated, an asylum office Director determines which personnel (e.g., Asylum Officer, Asylum Clerk) perform certain procedures outlined in this Manual.

### 1.   Manual Structure

The Manual is divided into five (5) sections. The first section, "*Background Information*," lists references that all asylum personnel should be familiar with in order to process an asylum application. The second section, "*The Affirmative Asylum Application*," follows the processing of an application from the point at which an applicant receives a blank asylum application, through the issuance of a decision by the Immigration and Naturalization Service (INS).

The third and most lengthy section, "*Expanded Topics*," provides more detail on some topics referred to in the second section, and includes topics that may cause an asylum application to be handled differently from the norm. While it is not possible to anticipate all possible variations, this section addresses the most common.

The fourth section, "*How To...*" explains how to prepare certain documents that asylum office personnel issue to applicants in support of a decision to approve, deny or refer an asylum application.

The fifth and final section, "*Appendices*," discusses how to use the appendices referred to in the Manual.

### 2.   How to Search the Manual

This Manual is not indexed, but contains a detailed Table of Contents to assist asylum office personnel in locating needed materials. In addition, asylum office personnel can search the Manual electronically. In Microsoft Word, the search feature can be added as an icon on the standard toolbar. The search feature can also be accessed by selecting the drop-down menu "Edit" and selecting the "Find" feature. Key words relating to the topic can be typed in and searched. A similar feature is available in Adobe Acrobat. For more assistance on electronic word searches, consult with the asylum office's ADP officer or Quality Assurance/Trainer.

### 3.   General Notes

"Day" as used in this Manual refers to a calendar day unless "business day" is specified.

## B.   REFERENCES

### 1.   Written and Electronic Materials

This Manual is the main procedural guide to processing affirmative asylum applications. The following reference materials are available to asylum office personnel and should be consulted for additional procedural guidance:

- Refugee Asylum and Parole System User's Manual (hereinafter referred to as RAPS User's Manual)
- Refugee Asylum and Parole System Reports Manual (hereinafter referred to as RAPS Reports Manual
- ABC/NACARA Procedures Manual
- Records Operations Handbook (M-407)
- PC-RAFACS User Manual
- NFTS User Manual (After NFTS [National File Tracking System] has been deployed to the asylum office to replace PC-RAFACS)
- AOBTC Basic Training Materials (Specific Lesson Plans are referred to in this Manual)
- Credible Fear Procedures Manual
- Langlois, Joseph E. INS Asylum Division. *Implementation of Amendments to Asylum and Withholding of Removal Regulations, Effective March 22, 1999*, Memorandum to Asylum Office Directors, Supervisory Asylum Officers, QA/Ts and Asylum Officers (Washington, DC: 18 March 1999), 17 pp. [also referred to as Reasonable Fear Procedures].
- Immigration and Naturalization Service Easy Research & Transmittal System (hereinafter referred to as INSERTS). INSERTS is a CD-ROM that contains INS field manuals, administrative manuals, legal opinions and laws and regulations. It may also be accessed through the INS Intranet.
- INS web site at www.ins.usdoj.gov

Samples of all standard INS forms (e.g. I-94 card or Form G-28) that appear in this Manual may be found in the *Forms Binder* of the AOBTC Basic Training Materials.

## 2.    Sources of Authority

See the AOBTC Basic Training Materials, *Overview of the Asylum Program –Part II: Sources of Authority*. The adjudication of an asylum application is governed by:

- Immigration and Nationality Act (INA), particularly sections 208 and 235.
- Title 8, Code of Federal Regulations (8 CFR), particularly part 208.
- Precedent Board of Immigration Appeals (BIA) decisions
- Federal Court decisions (including, U.S. District Courts, U.S. Courts of Appeal and the U.S. Supreme Court)
- INS General Counsel (GENCOU) Opinions

## 3.    Computer Databases

Asylum Office personnel use several computer databases that include:

### a.    Refugee Asylum and Parole System (RAPS)

RAPS tracks the processing of affirmative asylum and suspension/special rule cancellation (NACARA 203) applications through the affirmative asylum process. RAPS also contains an Executive Office for Immigration Review (EOIR) screen that allows a viewer to see whether a particular alien-number (A-number) pertains to a case within the Immigration Court system, and the status of that case. Asylum office personnel have access to update and change information in RAPS. Service Centers have access to RAPS for the purpose of entering new filings and adding dependents. Other INS branches only have "Look" access to this system.

### b.    Central Index System (CIS)

The Interagency Border Inspection System (IBIS) is "a multi-agency database of lookout information ... initiated in 1989 to improve border enforcement and facilitate inspection of individuals applying for admission to the United States at ports-of-entry and pre-inspection facilities. The IBIS initiative began in response to both legislative and administrative mandates, as well as to evolving agency needs for a more efficient primary inspection at land, air and sea ports-of-entry." *INS Inspector's Field Manual*, Chapter 33. The system itself resides at the U.S. Customs Service Data Center on the Treasury Enforcement Communications System (TECS). *U.S. Customs IBIS Fact Sheet*. "In addition to the U.S. Customs Service and the INS, law enforcement and regulatory personnel from 20 other federal agencies or bureaus use IBIS. Some of these agencies are the FBI, Interpol, DEA, ATF, IRS, the Coast Guard, the FAA Secret Service and the Animal Plant Health Inspection Service, just to name a few. Also, information from IBIS is shared with the Department of State for use by Consular Officers at U.S. Embassies and Consulates." *Id.*

Through IBIS, users can gain access to the FBI's National Crime Information Center (NCIC). NCIC, established in 1967, is "a nationwide information system dedicated to serving and supporting criminal justice agencies -- local, state, and federal -- in their mission to uphold the law and protect the public. [It] serves criminal justice agencies in all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, and Canada, as well as federal agencies with law enforcement missions." *See* FBI Criminal Justice Information Services Division web site at http://www.fbi.gov/hq/cjisd/ncic.htm. NCIC contains information on wanted persons, missing persons, stolen property, criminal history, criminal investigations, terrorists, and foreign fugitives. *See* U.S. Customs Service. *NCIC/NLETS* (July 2001). Currently, IBIS users in the adjudications environment are limited to NCIC's "hot files," also known as wants and warrants. Access to NCIC's criminal history data through IBIS is not authorized at this time. *See* Yates, William R. Immigration Services Division. *Utilization of the National Crime Information Center (NCIC)*, Memorandum to Regional Directors, et al. (28 September 2001).

The justification for conducting IBIS checks on benefit applications is two-fold. First, it furthers the mission of the INS to have all relevant information at its disposal when adjudicating benefit applications, in order to prevent individuals from obtaining immigration benefits for which they are ineligible. Second, it helps to fulfill INS law enforcement responsibilities by assisting law enforcement in identifying risks to the community and/or national security. Guidance on using IBIS is included in *Identity and Security Checks*, Section (III)(L), below, and in the *INS Immigration Services Division IBIS Standard Operating Procedures (SOP)*, which was distributed to all asylum offices in December 2002, and may be found on the IBIS Bulletin Board in cc:Mail.

# II.   THE AFFIRMATIVE ASYLUM APPLICATION

## A.   ALIEN OBTAINS ASYLUM APPLICATION PACKET

### 1.   How to Obtain

8 CFR 208.3

Prospective asylum applicants may obtain an asylum packet by:

- Calling the INS forms request line: 1-800-870-FORM (3676).
- Requesting the packet in person at an INS District Office.

INS does not charge a fee to provide an asylum packet to a prospective applicant; however, a fee may be charged to an attorney or

- Requesting the packet in person or by mail from an Asylum Office.
- Requesting the packet from a member of the private immigration bar or an agency accredited by the Board of Immigration Appeals (BIA).
- Downloading the form from the INS web site at www.ins.usdoj.gov.

*representative if s/he orders large quantities.*

## 2.      Asylum Packet Contents

An asylum packet consists of:
- The most recent acceptable version of the Form I-589, *Application for Asylum and for Withholding of Removal*
- Form AR-11: *Alien Change Of Address*
- Notice of Counsel and Consequences of Filing
- Executive Office for Immigration Review (EOIR) Representative List

## 3.      What Applicant Must File

At a minimum, an applicant must submit the following to apply for asylum:

- Original I-589, which is completed in English and signed by the applicant and preparer, if any.
- Two (2) copies of the completed and signed I-589.
- One (1) passport-style photograph.

*"Original I-589" is an I-589 with the original signature plus any supplemental sheets and/or statements.*

If an applicant has a spouse or child in the U.S. who wants to be included as a dependent on the I-589, an applicant must also submit the following for each dependent:

- One (1) copy of his/her asylum application that includes the dependent's information.
- At a minimum, an applicant is permitted to submit only copies of pages 1, 2, 3, and 9 (including Supplement A Form I-589 as needed for additional family members) of the P.A.'s application in lieu of the entire I-589 and supplemental documentation.
- One (1) photograph of the dependent that s/he wants to add, stapled on page 9 of the dependent's copy.
- One (1) copy of evidence of relationship:
- A marriage certificate, if the dependent is a spouse.
- A divorce decree, if the P.A. or spouse was previously married.
- A birth certificate, if the dependent is a child.

If a P.A. does not have and is unable to obtain a marriage or birth certificate, s/he may submit a copy of secondary evidence of relationship. Secondary evidence may take the form of historical evidence; such evidence must have been issued contemporaneously with the event that it documents and may include, but is not limited to, medical records, school records and religious documents. Affidavits may also be accepted.

*8 CFR 204.2(d)(2)(v) discusses secondary evidence to support a petition for child or son or daughter.*

If an affidavit is the secondary evidence, the P.A. must submit one (1) original and two (2) copies of an affidavit from at least one (1) person for each event the P.A. is trying to prove. A relative or other person may provide an affidavit, and s/he need not be a United States citizen or lawful permanent resident. An affidavit must:

- Fully describe the circumstances or event in question and fully explain how the affiant acquired knowledge of the event(s).
- Be sworn to, or affirmed by, a person who was alive at the time of the event(s) and have personal knowledge of the event(s) (date and place of birth, marriage, etc.) that

the P.A. is trying to prove.
• Show the full name, address, date and place of birth of the affiant, and indicate the relationship between him/her and the P.A.

## B.  APPLICANT FILES I-589

### 1.  Filing with the Service Centers

An applicant mails his/her I-589 and any supporting documentation to the appropriate Service Center, determined by the applicant's address.  A list of Service Centers and the areas they service are outlined in the I-589.

> The term "I-589" refers to a Form I-589 and any supporting documentation.

### 2.  Filing Directly with the Asylum Offices

An asylum applicant may file his/her I-589 with the asylum office at the express consent of the Asylum Office Director or when a principal/dependent relationship has ceased to exist and the former dependent is filing an asylum application as a principal.  See 8 CFR 208.5(b)(2).  A Directors' consent to file in the local office is normally given under the following circumstances:

> Check with local asylum office management for a list of all cases that may be directly filed.

• Expeditious processing is required.
• Previously denied or withdrawn asylum application where the applicant was not placed into deportation, exclusion or removal proceedings.

## C.  INS RECEIVES I-589

### 1.  I-589 Filed with the Service Center

The Service Center is responsible for:

• Receiving and receipting an I-589.
• Checking available databases for duplicate filings and multiple alien-numbers (A-numbers) or for evidence that the applicant is/has been in proceedings.
• Matching an I-589 with already existing alien-files (A-files) where they exist.
• Creating a new A-file where there is no prior A-file for the asylum applicant.
• Entering the I-589 into RAPS and forwarding the file to the appropriate asylum office.

### 2.  I-589 Filed Directly with the Asylum Office

An asylum office processes a direct filing of an I-589 as follows:

#### a.  Mailroom Processing

On the same day of receipt, asylum office personnel stamp the I-589 with the date of receipt and bring it to the attention of a Supervisory Asylum Officer (SAO) or Quality Assurance/Trainer (QA/T), depending upon local policy.  The SAO or QA/T determines whether the I-589 fits into one of the categories for which a direct filing is permitted and reviews the I-589 to ensure it meets the specifications for completeness.  If an I-589 is erroneously filed with the asylum office or incomplete, asylum office personnel return it to the applicant with written instructions indicating the corrective action that the applicant must take in order to properly file the application.

#### b.  Computer Entries

No information is entered in INS databases until it is determined that the I-589 is properly fil d   i h  h    l    ffi    d  h  h I 589       h     ifi  i   f      l

filed with the asylum office and that the I-589 meets the specifications for completeness. <u>Once the I-589 has been reviewed and found properly filed and complete</u>, asylum office personnel enter the application into RAPS on the Case Entry (I589) screen within one business day of receipt. Asylum office personnel first check the applicant's personal information against information in CIS, DACS, and RAPS for duplicate files. If none exist, asylum office personnel create an A-file by assigning the applicant an A-number, and entering the information into RAPS. If an A-file already exists, asylum office personnel order the A-file and create a Temporary File (T-file).

The name of an applicant who has only one name is entered into RAPS, CIS or other system as a last name. In the first name field, enter "No Given Name." Dependents are added using the F10 ("Add Rel") function key.

> For further information on creating an A-File, see Records Operations Handbook (M-407), chapter 2 in INSERTS.

Asylum office personnel send a copy of the I-589 to DRL/CRA in accordance with Section II(L)(2) of this Manual, *AO Sends a Copy of I-589 Sent to DRL/CRA, if not Previously Sent*. For high-profile cases, HQASM will forward an additional copy of the I-589 to DRL/CRA with the assessment when the decision is submitted for HQASM/QA review.

### c.    Accepting a New I-589 After Denial or Withdrawal of a Previous Application

An asylum applicant may apply for asylum after the issuance of a final denial, or dismissal of a motion to reopen or reconsider by the asylum office as long as s/he is not under the jurisdiction of the Immigration Court. An applicant who withdrew an asylum application may also submit a new application, as long as the asylum office has jurisdiction to hear the claim.

> A withdrawn asylum application cannot be reopened, except as provided in the *NACARA Procedures Manual* for rescission cases.
>
> See Section III(R) on prohibitions on filing.

Although the applicant may file a new asylum application, s/he is subject to the prohibitions on filing for asylum outlined in INA section 208(a)(2)(A), (B) or (C).

#### i.    Submission of a New Asylum Application

At this time, the Service Centers are not equipped to receipt applications where RAPS shows a final disposition of the case. An applicant must, therefore, file directly with the asylum office having jurisdiction over his/her place of residence. Applications received at the Service Center are forwarded to the asylum office for processing.

#### ii.    RAPS Entries

When an applicant files the new I-589, asylum office personnel locate the A-file that contained the previous asylum application. When this occurs, asylum office personnel take the following actions in RAPS:

- Print the CSTA screen that contains the information about the previously-filed asylum application. Place the printout on the right-hand side of the file.
- Delete the information from the previously-filed asylum application from RAPS using the Reinterview (REIN) command. Delete the filing date of the previous application using the Case Correction (CORR) screen, and enter the new filing date.
- If the asylum office that accepts the application is not the same office that adjudicated the previous application, the asylum office that has the new application must contact the asylum office that adjudicated the previous application to delete the information from RAPS, and update the MOVE/TRAN screens.

#### iii.    Interview and Adjudication

A newly-filed I-589 receives a new interview and adjudication by an AO, and the prohibitions on filing are explored during the asylum interview. Prohibitions on filing for

asylum, including the one-year filing deadline and prohibition on filing after a prior denial by EOIR, are discussed below, Section III(R), *Prohibitions on Filing an Asylum Application*. A prior denial by INS does not invoke the prohibition on filing. The AO may consider the interview notes and *Assessment* from the previous application to develop lines of inquiry during the asylum interview. Findings of fact and law made by INS in the prior adjudication should not be disturbed, absent error or a change in circumstances.

# D.    RAPS ACTIVITY AFTER DATA ENTRY OF I-589

## 1.    Receipt Mailers

*Acknowledgment of Receipt* mailers are printed in the asylum office the day after the new file data is entered into RAPS. Asylum office personnel mail the mailers within three (3) business days of their printing, and file copies of the mailers in the applicant's file within ten (10) days of their printing, or no later than ten (10) days after receipt of the A-file from the Service Center, whichever is later.

## 2.    File Transfer Requests

RAPS updates CIS and generates a File Transfer Request (FTR) for any case entered as a new application that has an existing A-file in another INS location. This information is automatically printed at the INS location housing the A-file. The FTR requests that the A-file be sent to the asylum office with jurisdiction over the newly filed I-589.

For information on File Transfers see Records Operations Handbook (M-407), chapter 3(A)(2) in INSERTS.

## 3.    Automated Records Checks

### a.    INS Systems – DACS, NAILS and APSS

Data from RAPS is compared to data in DACS, NAILS and APSS. If the comparison results in a potential match, a "Y" flag appears next to the system name on the CSTA screen.

### b.    IBIS

Data from RAPS is uploaded to the INS mainframe for assembly of a batch records run in the Interagency Border Inspection System (IBIS). A potential match result is flagged with a "Y" next to the system name on the CSTA screen.

### c.    CIA and FBI name checks

Every asylum applicant's biographical data are downloaded from RAPS onto a computer tape and that tape is forwarded to the CIA and FBI for security checks. CIA and FBI notify INS if records pertaining to the applicant exist.

See Section III(C) for more information on CIA checks. More information on the FBI name check process is available in section III(L)(4).

## 4.    Fingerprint Scheduling

All asylum applicants aged 14 to 74, who filed for asylum on or after March 12, 1998, are scheduled to submit their fingerprints to INS at an INS-approved fingerprinting site so the FBI may conduct a confidential background investigation. These sites include Application Support Centers (ASC) and designated Law Enforcement Agencies (LEA). RAPS automatically requests the scheduling of a fingerprint appointment:

- Within 3 days of a new case being entered into RAPS, except for circuit ride cases.
- For an applicant living in a circuit ride location, when an interview is scheduled, either via automated scheduling or manual scheduling using the

See Section III(L) for procedures on the identity and security check process.

ADDC command.
- When a dependent is added to RAPS and a "Y" is placed in the "New A-file (Y/N)" field on the I589 screen.

# E.    A-FILE IS TRANSFERRED TO ASYLUM OFFICE

## 1.    From the Service Center

The Service Center forwards new files to the appropriate asylum office within 21 days of receipt of the complete I-589. The files of family groups are sent rubber-banded together.

## 2.    From Other INS Locations

File Transfer Requests (FTRs) are generated by CIS. Any INS facility holding an A-file that corresponds to asylum application data (entered at the Service Center) should respond to the FTR by sending the A-file to the appropriate asylum office.

# F.    ASYLUM OFFICE RECEIVES A-FILE

## 1.    Receiving File from Service Center

When an asylum office receives an A-file from the Service Center, asylum office personnel check the file in RAPS (CSTA screen) to verify that it has been sent to the correct asylum office according to the assigned File Control Office (FCO). It is not necessary to confirm receipt of the file in CIS since the Service Center has indicated in CIS that the FCO is the receiving asylum office. However, asylum office personnel must enter the file into RAFACS and keep family groups together.

## 2.    Receiving File from Other INS Locations

When an asylum office receives a pre-existing A-file from another INS location, asylum office personnel take the following actions:

- Update CIS to confirm the asylum office received the file.
- Check RAPS and CIS to ensure it is a file needed for the adjudication of an asylum application.
- Enter the file into RAFACS and see if there is a corresponding T-file or W-file. Physically consolidate any W-file or T-file into the A-file and delete the W-file or T-File from RAFACS, unless the A-file pertains to a Legalization/SAW application. See Section III(B)(9) on Legalization/SAW applications, and Section III(K)(1) on file consolidations of multiple A-numbers.

*For procedures regarding file consolidation, see Records Operations Handbook (M-407), chapter 3(C) in INSERTS.*

# G.    ASYLUM OFFICE SCHEDULES INTERVIEW

Entering a case into RAPS creates a pool of cases that are ready to be scheduled for an asylum interview. The asylum office creates a monthly interview calendar and sets scheduling parameters that are determined by the number of AOs that will be available to interview in that month.

## 1.    Asylum Office Creates an Interview Calendar in RAPS

An asylum office creates a monthly interview calendar in RAPS using the Create Daily Calendar (CCAL) command. The number of cases that are scheduled for an interview in any given month depends upon each office's scheduling system that takes into consideration staffing resources and no-show rates. Through the CCAL screen, the

asylum office tells RAPS how many asylum applicants to call-in for an interview by "opening" a certain number of interview slots. The number of slots the asylum office opens is based upon each office's staffing resources.

Once the asylum office creates an interview calendar, it may be viewed by using the Calendar Query (CALQ) command.

## 2.    Cases are Selected for Interview Scheduling

### a.    Automatic Scheduling

Approximately 22 days before a particular interview day, RAPS fills that day's opened interview slots with cases from the pool that was created when I-589s were entered into the system.

<div style="float:right">For information on "special group codes," see RAPS Users Manual.</div>

Cases in the pool that are marked with a special group code will not be picked up for scheduling as part of the automatic scheduling system, unless the interview calendar indicates that a particular special group case should be scheduled.

### b.    Manual Scheduling

Cases may be manually scheduled to available interview days by utilizing the Add Case to Schedule (ADDC) command in RAPS. Reasons for manually scheduling a case may include; the scheduling of an expedited interview for a particular I-589, and a rescheduling of an interview due to lack of available AOs to interview on a given day. When ADDC is used to schedule an interview at a circuit ride location, RAPS will automatically initiate the scheduling of a fingerprint appointment for the applicant.

Before using the ADDC command, asylum office personnel check to see if interview slots have been opened for a particular day by viewing the Calendar Query (CALQ) command.

### c.    Scheduling Priorities

All cases within the pool are categorized into priorities. RAPS automatically schedules cases in the following order, exhausting each priority listed before scheduling cases from the next priority group:

**Priority 1:**    Reform rescheduled cases.
**Priority 2:**    Reform cases beginning with those aged 21 days and working towards the newer cases (i.e., from 21 days old to 1 day old).
**Priority 3:**    Reform cases that are between 22 and 100 days of receipt, from newest to oldest (i.e., from 22 days old to 100 days old).
**Priority 4:**    Reform cases that are over 100 days from day of receipt, from newest to oldest (i.e., 100 days to 999 days).
**Priority 5:**    Pre-reform rescheduled cases.
**Priority 6:**    Pre-reform cases where the applicant requests an immediate interview and the interview is added to the scheduler through use of the INTERVIEW REQUEST (INTR) command.
**Priority 7:**    Pre-reform cases, starting with the most recently filed and working to the older cases in the backlog from the newest to the oldest.

### d.    RAPS/CLAIMS Interface for Certain Administratively Closed Cases

The asylum offices administratively closed many pre-reform asylum applications after applicants failed to appear for an interview. Many of the individuals were not placed before the Immigration Court because the asylum office did not have sufficient

information to establish their deportability.

If an applicant in this category files for an extension of his/her Employment Authorization Document (EAD), or any application that is entered into CLAIMS, a CLAIMS/RAPS interface triggers RAPS to reopen the case for interview scheduling. CLAIMS also updates RAPS with the new address. RAPS automatically puts the A-number in the Priority 5 category.

### 3. Asylum Office Generates and Mails *Interview Notice*

When RAPS fills an open interview slot with a case, the system automatically generates an *Interview Notice*. If an applicant's representative is recorded in RAPS, RAPS generates an identical *Interview Notice* to the representative of record. An *Interview Notice* is printed in the asylum office during the night. Within three (3) business days of the *Notices* being printed and no less than 18 days before the scheduled interview date, asylum office personnel mail the *Interview Notice* to the applicant and any representative of record. Asylum office personnel file the mailers in the applicant's file within twelve (12) days of their printing.

*Exceptions to these requirements can be made in particular cases at the discretion of the Director for special circumstances, as long as the applicant receives adequate notice of the interview.*

## H.  ASYLUM OFFICE PULLS FILES FOR INTERVIEW

Each office has its own system for pulling files scheduled for an interview. At a minimum, the system must provide that:

- A-files activated from the file room are assigned to a responsible party in RAFACS in such a way that they are traceable throughout processing of the I-589.
- The A-files of all applicants scheduled for an interview are in the asylum office. If the asylum office cannot locate an A-file by the date of the interview, the staff responsible for distributing A-files on interview days must be informed. An applicant whose A-file is not in the asylum office, and who appears for his/her interview, may not be interviewed unless the applicant has a copy of his or her I-589.
- The EOIR screen is checked prior to the interview to confirm the applicant is not under the jurisdiction of EOIR. Local office policy dictates the timing of the check and the personnel who perform it. The EOIR screen is printed out for all T-files.

*See Section III(K) for procedures on interviewing and adjudicating a case using a T-file or a W-file.*

## I.  APPLICANT ARRIVES FOR INTERVIEW

### 1. IDENT-Asylum

When an asylum applicant appears for the interview, asylum office personnel enroll him/her and all dependents 14 years old and older into the IDENT–Asylum system. Each asylum office has an IDENT coordinator and established local operating procedures that facilitate IDENT–Asylum processing while maintaining an efficient processing of asylum applications.

During the enroll process, IDENT-Asylum checks three databases: *Lookout, Recidivist,* and *Asylum*. The *Lookout* database contains information on the following types of aliens.

*Check with local asylum office management for procedures on IDENT-Asylum, including how to process a case when an applicant is found in one of the databases.*

- Any alien who has been convicted of an aggravated felony as defined in of the INA § 101(a)(43);
- Any alien who an immigration officer knows or has reason to believe is or has been an illicit trafficker in any controlled substance and who is inadmissible under INA § 212(a)(2)(C);

November 2001), 2p.

such cases when asylum is not granted.

When referring a person who appears to be covered by DED, include a memorandum to the file addressed to District Counsel and Detention and Removal indicating, "The individual who is the subject of this memorandum may be covered by Deferred Enforced Departure (DED)."

## 7.    Expeditious Processing Required

An asylum office Director may determine that it is in the best interest of INS to process an asylum application more expeditiously than usual because the case contains sensitive issues or there is special interest in the case.  Examples include, but are not limited to applicants who are being placed in witness protection programs; applicants who are providing information of national security concerns to other agencies within the Federal Government; and cases in which there is a family member in jeopardy (e.g., spouse or child of an asylum applicant is in danger of harm in the country of claimed persecution).

Once the Director determines that the asylum office will expedite the processing of an asylum application, the following process occurs:

- The Director or Security Officer communicates the essential facts of the case to the HQASM Supervisor, Quality Assurance/Training at (202) 305-2759.  HQASM/QA alerts the INS Public Information Officer, if appropriate, and the DRL/CRA.
- Upon receipt of the application, asylum office personnel send the I-589 application and supporting documents to HQASM/QA and the appropriate desk officer in DRL/CRA.  The DRL/CRA may decide to respond telephonically directly to the asylum office Director, with written confirmation to follow.
- An AO interviews the applicant as soon as practicable and prepares an *Assessment*.  Following the interview the asylum office sends to HQASM/QA the I-589, supporting documentation, *Assessment*, interview notes, and any recommendation from DRL/CRA.  If the materials are 15 pages or less, asylum office personnel may fax them to HQASM/QA at (202) 305-2918.  If the materials are more than 15 pages, asylum office personnel sends them to HQASM/QA via Federal Express at 111 Massachusetts Avenue, 2nd floor, ULLICO Bldg., Washington, D.C. 20001.
- HQASM/QA responds within three days of receipt.  Until then, the asylum office places the case on HOLD - HQ in RAPS.

## 8.    GTMO/DED Haitians

Certain Haitian nationals who filed for asylum before December 31, 1995, or were paroled into the U.S. before December 31, 1995, were eligible for deferred enforced departure (DED).  These same individuals were also entitled to apply for Lawful Permanent Resident (LPR) status through the Haitian Refugee Immigration Fairness Act (HRIFA). The special group codes in RAPS for these cases are "HDD," "HGN," "HGT," "HGX" and "HGY."

Until further notice by HQASM, an asylum office does not interview an asylum applicant who was eligible for Haitian DED, unless the applicant requests to proceed with the affirmative asylum adjudication.  See Langlois, Joseph E. INS Asylum Division. *Suspension of Adjudication in the Cases of DED Eligible Haitian Applicants*, Memorandum to Asylum Office Directors (Washington, DC: 14 January 1998), 2 p.

A determination to place a case on hold and wait for an A-file must be made in consultation with the SAO, as it may impact on how the case will be processed (Pick-up vs. Mail-out). As a general rule, the processing of an asylum application should not be upheld pending receipt of the other A-files that pertain to an applicant, except:

- when a legally correct and sufficient decision cannot be made without looking at the applicant's other A-file(s), OR
- when the applicant is eligible for asylum. An asylum office may not issue an *Asylum Approval* until all A-files are consolidated (except for a Legalization/SAW file). If, however, 90 days have passed since the initial attempt to obtain the A-file(s), follow procedures in (3)(a) or (3)(b) of this section. A recommended approval may be issued pending the receipt of the other files, unless there is an indication that evidence of ineligibility is contained in the other file(s).

## 2.     Work Folders ("W-files")

A W-file is an "in-house" folder created in the absence of both an A-file and a T-file. A work folder contains non-record copies of correspondence or other materials. Under **no** circumstances should a W-file leave the office in which it was created. If the A-file is not located, and it becomes necessary to send the file out of the office for further processing, the W-file must be converted into a T-file.

> For further guidance on the creation and use of W-files, see <u>Records Operations Handbook (M-407)</u>, chapter 2 in INSERTS.

## 3.     Temporary Files ("T-files")

The Service Center will generate a T-file whenever a review of the various INS databases indicates an applicant has a pre-existing A-number with INS (other than a Legalization/SAW file). In addition, any INS office may create a T-file when it becomes necessary for the office to take action on a case in the absence of the A-file.

> For further guidance on creating and using T-Files, see <u>Records Operations Handbook (M-407)</u>, chapter 2 in INSERTS.

If an AO must use a T-file during the adjudication of an asylum claim, the *Asylum/NACARA 203 Processing Sheet for T-Files* (Appendix A 63) is completed. Asylum office personnel immediately order the A-file in CIS, and place a copy of the 9504 screen on the right-hand side of the T-file. DACS, NAILS, and EOIR (PF11 on the 9101 screen in CIS) must be checked prior to the interview. In addition, asylum office personnel must make an effort to obtain the A-file and document the efforts on the processing sheet. This effort includes calling the office that possesses the A-file.

> See Williams, Johnny N. INS Office of Field Operations. *Responsibilities of Adjudicators*, Memorandum to Regional Directors, et al. (13 November 2002), 2 p.

If any records check is positive, asylum office personnel follow existing procedures to obtain and resolve the cause for the positive records check. The resolution of the hits must be documented in writing before adjudication on a T-file, preferably attached to the processing sheet.

### a.     Interviewing an Applicant When the Asylum Office Cannot Locate an A-file or T-file

If the asylum office cannot locate an A-file or T-file, or has not received the file from another INS office, the interview may proceed only if the AO is able to obtain a copy of the applicant's I-589 from the applicant or another INS office with the file. If the I-589 is received, a T-file is created to store the applicant's records until the A-file is located or received.

If an I-589 is not available, the asylum office reschedules the interview using the Remove Case from Schedule (REMC) command, indicating the rescheduling is at the fault of INS. Asylum office personnel make a concerted effort to locate the file. If, upon the applicant's return, the asylum office still cannot locate the file, the applicant may be

asked to submit a new application directly to the asylum office for further processing. An asylum interview may not be conducted unless the AO has at least a copy of the I-589.

### b.    Adjudicating an Application on a T-file

An asylum office may issue a *Referral, NOID, Final Denial* or *Recommended Approval* on a T-file unless there are reasonable grounds for believing information in the A-file would materially impact on the decision. A determination to wait for an A-file must be made in consultation with the SAO, as it may impact on how the case will be processed (Pick-up vs. Mail-out). If a decision is made on a T-file because the A-file could not be located or obtained after established procedures were followed, this must be documented on the *Asylum and NACARA § 203 Background Identity and Security Checklist* (Appendix A 62), which is reviewed and signed by an supervisory asylum officer (SAO) prior to decision issuance. **When any background check has a positive result (***i.e.***, a confirmed or possible matching record exists), adjudication on a T-file cannot proceed until the Asylum Office Director or Deputy Director has reviewed and concurred in the decision.** This authority may not be delegated.

An asylum office may NOT issue an *Asylum Approval* on a T-file, except as indicated below, this section

### i.    *CIS Indicates Another INS Office has the A-file*

By the time the asylum office is ready to issue a final decision, the asylum office, at a minimum, must have ordered the A-file in CIS and called the office that possesses it. There are several reasons why an A-file may not be sent to the asylum office, and they are usually recorded in CIS on the 9504 screen:

- M – The A-file is missing and the office is doing a special search.
- I – The A-file was transferred to the office that requested it (REQUEST FCO field); however, either that office did not receive it or confirm it into CIS as having been received, so it is still "in transit" according to the system.
- A – An application for another benefit is in process so the office cannot release the A-file.
- D – The A-file is under docket control, so the applicant was or is currently in the DACS system.
- F – The A-file was found, but not sent. A reason could be that it is needed in the office for something other than the processing of an application.
- P – The A-file is currently being used by INS Investigations
- N – The A-file was not found in the location according to the office's file control system. It is temporarily lost.